**Alfred W. JOHNSON, Jr., Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 89–CF–818, 91–CO–218.**

District of Columbia Court of Appeals.

Argued Nov. 1, 1991.
Decided Aug. 14, 1992.

Anne H.S. Fraser, Washington, D.C., for appellant.

Barry Wiegand, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and Ronald Dixon, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before FERREN and WAGNER, Associate Judges, and KERN, Senior Judge.

PER CURIAM:

On February 6, 1989, appellant was convicted by a jury of first degree burglary, D.C.Code § 22–1801(a) (1989 & 1991 Suppl.), assault with a dangerous weapon, iron, *id.* at § 22–502, malicious disfigurement while armed, *id.* at §§ 22–506, –3202, and rape while armed, *id.* at §§ 22–2801, –3202. After he filed a timely notice of appeal, appellant filed a motion for a new trial under D.C.Code § 23–110 (1989) claiming ineffective assistance of counsel and newly discovered evidence. Following a hearing, the trial court denied most of appellant's collateral claims.[1]

---

**1.** The trial court upheld appellant's claim that the assault with a dangerous weapon conviction merged with the rape while armed conviction. (Memorandum Opinion, February 12, 1991, at 38–39) (citing *Sansone v. United States,* 380 U.S. 343, 349, 85 S.Ct. 1004, 1009, 13 L.Ed.2d 882 (1969)). The court properly deferred vacating the ADW conviction until this court had an opportunity to determine on direct appeal whether the rape while armed conviction should be vacated. *See infra* note 2.

Appellant now asserts the following claims on consolidated appeal: (1) the trial court erred in denying his § 23–110 motion for a new trial based on his claim of ineffective assistance of counsel; (2) appellant did not knowingly waive his constitutional right to testify at trial; (3) the evidence presented at trial was insufficient to support a conviction for burglary; (4) the evidence was insufficient to support a conviction for armed rape; (5) the trial court abused its discretion in admitting a photograph of complainant's injury; (6) the trial court abused its discretion by examining the complainant and the government's medical expert; (7) the trial court erred when it failed to declare a mistrial or provide a curative instruction after the prosecutor commented on appellant's theory of the case during rebuttal argument; and (8) the trial court abused its discretion when it imposed a sentence based on inadequate information and unfounded assumptions.

We unanimously affirm with respect to seven of the questions presented for the reasons set forth hereafter.[2] As to the contention that the evidence was insufficient to support the burglary conviction, a majority of the court rejects appellant's contention and concludes that the evidence presented was sufficient for the reasons set forth in Judge Kern's opinion following the per curiam opinion. Judge Ferren's dissent on this issue is contained in his opinion.

## I.

Between 1982 and 1987, appellant and the complaining witness, Nicolle Townes, engaged in what might best be described as an up-and-down romance, punctuated by frequent arguments and fighting. Ms. Townes testified that she attempted to break up with appellant during December 1987 and January 1988. On January 27, 1988, appellant called Townes and asked to see her. She agreed to see him at her house the next day. Sometime around 1:30 a.m. on January 28, 1988, appellant tele-phoned Townes, but her mother, Antonia DaSilva, who lived with her, answered the phone and hung up. DaSilva testified that appellant then called over and over and that each time she hung up on him. About a half hour later, DaSilva heard appellant knocking on their front door and calling out Townes' name. Both DaSilva and Townes ignored appellant, and he soon left. Later, DaSilva heard another knock on the door and looked out the window and saw appellant's van. Appellant returned to his van and blew his horn for "quite awhile" before leaving again.

Around 8:30 a.m., after DaSilva had left for work and while Townes was ironing in her bedroom, appellant returned again and knocked on the front door, called out Townes' name, and, when no one answered, entered the house. There was no evidence of forced entry, but there was evidence that appellant knew a pane of glass was missing from a door on the ground floor of the house. Appellant walked up the stairs and into Townes' bedroom. According to Townes, she crouched down in her doorless closet. After appellant entered the room and saw her, he hugged and kissed her once and told her that he missed her. The two then began to argue about where she recently had been. After the argument intensified, Townes told appellant to leave. He refused, struck her, picked up the hot iron off of the ironing board and, according to Townes, "put it on [my] stomach and [my] breasts." Appellant returned the iron to the ironing board as Townes ran downstairs to the front door in an attempt to escape. Appellant somehow prevented her from leaving, and Townes then ran to the basement in an effort to flee through the basement door, but appellant stopped her again. Appellant told her to go upstairs, take off her pants, and lie down on her bed. In great pain from the burn, Townes complied, fearing appellant might hurt her again. Appellant then had sexual intercourse with her.

**2.** Because we sustain the armed rape conviction, we also remand for the trial court to vacate the assault with a dangerous weapon conviction which merged with armed rape. Because the ADW conviction will be vacated, appellant's argument that the ADW conviction merged with the malicious disfigurement conviction is now moot.

Over the next several hours, Townes tried once to hide from appellant in her mother's room, a friend of her mother's knocked on the front door but left when no one answered, and at some point appellant fell asleep lying in bed with Townes. Townes did not attempt to escape while appellant was asleep. When appellant woke up, Townes made him a sandwich at his request, then the two left the house together around 5:00 p.m. Once outside, Townes fled screaming and crying to the home of a neighbor, Juanita Rose. Townes told Rose that appellant had burned and raped her and showed Rose her terrible burn. Townes called her mother, who immediately left work to come to take her home. Sometime later, DaSilva called the police and an ambulance. The Washington Hospital Center admitted Townes at about 9:00 that night, and she stayed there for five days.

Townes spoke to the police at the hospital but did not tell them she had been raped because she was not sure "if it was considered rape" since she and appellant had been "going together." Dr. Marion Jordan, director of the Hospital's burn unit, treated Townes and later testified for the government at trial. According to Dr. Jordan, Townes received superficial to moderate second degree burns over a V-shaped area extending across the left breast down almost to the navel and up on to the right breast. The burn was extremely painful and left a permanent scar.

## II.

Appellant claims the trial court erred in refusing to rule that his defense counsel had provided ineffective assistance by failing to investigate and present favorable medical evidence, failing to understand the necessary evidentiary foundation for presenting a theory of self-defense, and failing to advise appellant fully concerning his right to testify. Before evaluating these claims, we briefly recount the relevant events at trial and the evidence at the § 23–110 hearing where burn specialist Dr. Carlos Silva, appellant's trial counsel, and appellant testified.

Before trial, defense counsel consulted a D.C. General Hospital intern or surgeon who was not a burn specialist about the nature of Townes' burn. Counsel, however, did not show the physician one of the many available photographs of the burn. At trial, defense counsel used medical records to cross-examine the government's medical expert, Dr. Jordan, but did not present a medical expert of his own. At the § 23–110 hearing, appellant argued that defense counsel had been deficient in failing to discover and present favorable medical evidence at trial. Dr. Silva testified for appellant at the hearing. He agreed in large part with the testimony of the government's expert at trial, Dr. Jordan, regarding the severity of Townes' burn and other technical details. Based on his review of the medical record and photographs of the burn, however, Dr. Silva concluded that the most likely cause of the burn was water or steam and not direct contact between the iron and Townes' skin. Although Townes testified at trial that appellant had placed the iron on her skin, Dr. Jordan was never asked to confirm that her burn was consistent with such direct contact.

In an effort at trial to establish self-defense, defense counsel attempted to present two witnesses with knowledge of Townes' aggressive nature and past violent acts. During the examination of the first witness (appellant's cousin), however, the government objected because there was no evidence appellant knew about Townes' purported aggressiveness or bad acts. The court sustained the objection, ruling that bolstering evidence from witnesses to prior acts of Townes was not admissible for lack of evidence from which appellant properly might raise the inference of self-defense: defense counsel had failed to draw out such a possibility in cross-examining Townes, and appellant had not yet testified to such a claim.

After the court sustained the government's objection, defense counsel asked for a recess to consult with appellant. According to defense counsel's testimony at the § 23–110 hearing, during the half-hour re-

cess counsel informed appellant that he would have to testify in order to establish a claim of self-defense. Appellant replied that he did not want to testify, did not believe the jury would credit his testimony over Townes' testimony, and worried he could not withstand the prosecutor's questioning. After the recess, defense counsel informed the judge that "after consultation with Mr. Johnson,. he has decided that we will not [be] calling any further witnesses." The court then informed defense counsel that it would instruct the jury to disregard the testimony of the last defense witness and that defense counsel could not be allowed to argue accident or mistake in his closing argument because of the lack of a factual predicate.

After the § 23–110 hearing, the trial court found appellant's trial counsel deficient in only one respect: failing to ascertain for sure, before proceeding with the defense case, whether appellant would testify. The court also found, however, that appellant had been aware that if he failed to testify at the trial, this failure would be fatal to his self-defense claim. The trial court concluded that under the totality of circumstances, "this deficient performance did not affect the reliability of the verdict." Among those circumstances were the following. The court found incredible both appellant's account of what happened on the day of the offenses and his report of what occurred during the trial recess. Because any defense appellant might have raised to the rape charge (such as consent) or to the assault while armed and malicious disfigurement charges (such as self-defense or accident) would have required appellant's testimony,[3] and because the court found that appellant was not a credible witness, the court concluded that any deficiencies of defense counsel were necessarily harmless since there was no " 'reasonable probability that absent [any] errors the fact finder would have had a reason-

able doubt respecting [appellant's] guilt.' " (Memorandum Opinion, February 12, 1991, at 16–17) (quoting *White v. United States,* 484 A.2d 553, 558 (D.C.1984)) (quoting *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984)). We agree.

■ It is established in this jurisdiction that "[t]he finding of ineffective assistance of counsel is a mixed question of law and fact ... and upon review, we will not reverse the trial court's findings of fact if they are supported by evidence in the record." *Curry v. United States,* 498 A.2d 534, 540 (D.C.1985) (citations omitted). Keeping in mind the trial court's role in credibility findings, and after reviewing the trial record and the § 23–110 hearing transcript, we conclude that the findings in the trial court's lengthy and detailed memorandum are sufficiently supported by evidence in the record. Furthermore, although "we owe no deference [to the trial court] on the ultimate question of law," *id.,* we agree that appellant has not carried his burden "that [he] affirmatively prove prejudice." *Strickland, supra,* 466 U.S. at 693, 104 S.Ct. at 2067.

■ Even if defense counsel was deficient in preparing for trial and in failing to anticipate the evidentiary foundation necessary to put forth various defenses, appellant must show "the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Id.* at 687, 104 S.Ct. at 2064. In an attempt to demonstrate prejudice, appellant points to defenses that would have been available but for defense counsel's deficiencies: accident, self-defense, mistake, and consent. The trial court found, however, that appellant chose not to testify despite the fact that his counsel had informed him that he would in

---

**3.** The trial judge had ruled that defense counsel had not established the evidentiary basis for these defenses in his cross-examination of Townes, the only person other than appellant who witnessed what had happened. Thus appellant himself would have had to testify to provide the necessary predicate for a consent,

accident, or self-defense argument. *See, e.g., Johns v. United States,* 434 A.2d 463, 467–69 (D.C.1981) (evidence of victim's violent character only relevant to self-defense issues—objective question of who was aggressor and subjective question of defendant's fear—when offered in support of predicate evidence of self-defense).

effect be giving up his claim of self-defense. Thus, appellant cannot blame trial counsel for the loss of that defense. Further, we conclude that in order for defense counsel to have argued any of those defenses (including those incorporating Dr. Silva's expert testimony) in the circumstances of this case, appellant would first have had to take the stand. *See* note 3, *supra.* However, the trial court as factfinder found that appellant's testimony regarding the events of January 28, 1988 was unbelievable. Since these are findings we cannot dispute on the record before us, we must conclude that appellant has failed to show the required prejudice: how the assumed "affirmative defense[s] likely would have succeeded at trial." *Hill v. Lockhart,* 474 U.S. 52, 59, 106 S.Ct. 366, 371, 88 L.Ed.2d 203 (1985); *see McAdoo v. United States,* 515 A.2d 412, 426–27 (D.C.1986) (even though counsel may not have put forth strong defense and may have been deficient in preparation, such transgressions even taken together do not rise to level of prejudice amounting to deprivation of fair trial); *Godfrey v. United States,* 454 A.2d 293, 302–04 (D.C.1982) (gross incompetence of defense counsel not enough to reverse appellant's conviction without showing that incompetence prevented substantial defense).

### III.

■ Appellant claims reversible error because he did not competently waive his fifth amendment right to testify. Under *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1937), a criminal defendant must knowingly, voluntarily, and intelligently waive a fundamental right. The Supreme Court has made clear that the right of a criminal defendant to take the stand and testify in his or her own defense is one such fundamental right. *Rock v. Arkansas,* 483 U.S. 44, 49–52, 107 S.Ct. 2704, 2707–09, 97 L.Ed.2d 37 (1987); *see Boyd v. United States,* 586 A.2d 670, 672–74 (D.C.1991). In *Boyd* we joined the vast majority of federal and state courts in holding that "the right to testify in a criminal trial is a fundamental and personal right which can only be waived by the defen-

dant" and not by his or her counsel. *Id.* at 674. In this case, by appellant's own admission, he informed his counsel months before trial that he did not want to testify, a desire he reiterated to counsel during their recess conference at trial. There is no question, therefore, that appellant made a knowing and voluntary decision not to take the stand.

■ The crux of appellant's claim, however, is that defense counsel did not fully inform him of the consequences of appellant's decision and thus that any waiver failed the "intelligent" prong of the *Zerbst* test. Appellant argues that defense counsel did not realize until after his recess conference with appellant that appellant's failure to testify would have the effect of precluding not only a self-defense theory but also the alternative defenses of accident, mistake, and consent. Because of defense counsel's own ignorance of the consequences, appellant argues that counsel could not have provided the necessary legal advice for appellant to make a fully informed, intelligent waiver of his right to testify.

The trial court specifically found that appellant did understand that his failure to testify would be fatal to his self-defense claim. The court also credited defense counsel's testimony that he had explained to appellant that the case might boil down to a credibility contest between appellant and Townes. Furthermore, the record clearly shows that appellant appreciated the dangers attendant if he were to take the stand: he would not be successful in withstanding the prosecutor's cross-examination, and that he would not compare favorably with Townes in the eyes of the jury. *See Kelly v. United States,* 590 A.2d 1031, 1034–35 (D.C.1991) (upholding trial court's denial of appellant's motion for new trial because evidence in record showed appellant understood his rights and was fully advised by counsel about consequences of testifying). Although defense counsel may have painted too optimistic of a picture for appellant regarding his chances in the absence of his testimony, we agree with the trial court that appellant

understood his own limitations as a defense witness and the risks he posed to his own case. We cannot say, therefore, that appellant did not intelligently waive his right to testify.

### IV.

We now turn to appellant's contentions that the trial court abused its discretion when it: (1) admitted into evidence photographs of the complainant's burns; (2) examined two witnesses; (3) failed to instruct the jury or declare a mistrial after the prosecutor commented in rebuttal on appellant's theory of the case; and (4) imposed sentence. We find no abuse of discretion.

### A. *The photographs*

■ Appellant argues that the court abused its discretion in admitting photographs of the burn because their "inflammatory" nature outweighed any probative value. More specifically, appellant complains that the court erroneously admitted one photograph, Government Exhibit 2, which the court initially had ruled inadmissible. The question whether to admit photographs as demonstrative evidence is within the trial court's sound discretion. *E.g., Rogers v. United States,* 483 A.2d 277, 291 (D.C.1984), *cert. denied,* 469 U.S. 1227, 105 S.Ct. 1223, 84 L.Ed.2d 363 (1985). The trial court has the duty to weigh the probative value of the photographs against any prejudicial effect they might have on the jury. *Id.* at 292. The court should not admit photographs if their primary purpose is to inflame the jury. *Villines v. United States,* 320 A.2d 313, 315 (D.C.1974).

■ The government originally wanted the court to admit into evidence three different sets of photographs of Townes' burns: the first set, including Government Exhibit 2, was taken by Linda Andrews, a friend of Townes, about five days after the incident; the second set depicted the burn during the healing process in March 1988, over a month after the incident; and the third set depicted the scar just before trial. In a preliminary ruling, the court decided the photographs in the first set would be admissible despite the terrible nature of the burn, as long as a witness could attest that the photos fairly and accurately portrayed the burn immediately after the assault. Juanita Rose, Townes' neighbor, fulfilled that condition at trial. The court further ruled that the photographs in the third set would be admissible to show the permanency of the scar. The court, however, ruled out admissibility of the second set as not fairly depicting the injury at the time of the incident and as unnecessarily cumulative. We agree with the trial court's well-reasoned ruling with respect to the admissibility of sets one and three.

Appellant argues in the alternative that the trial court erred in admitting Government Exhibit 2 because it was not part of admissible sets one or three. This argument has no merit. When questioning Andrews at trial about the photographs she shot of Townes five days after the incident (the first set), the prosecutor mistakenly referred to Andrews' "March" photographs. Andrews' response makes clear, however, that she shot the photographs, including Government Exhibit 2, right after Townes returned home from the hospital five days after the incident. Exhibit 2, therefore, was properly admitted as part of set number one.

### B. *The court's examination of witnesses*

■ Appellant argues the trial court committed plain error when it asked questions of two government witnesses after each side had completed its examination. In particular, the court questioned Dr. Jordan about the nature of a second degree burn and the pain caused by such a burn. The court also asked Townes about the events of January 28, 1988. We have stated before that "[t]he trial court 'must not take on the role of a partisan.... Prosecution and judgment are two separate functions in the administration of justice; they must not merge.'" *Robinson v. United States,* 513 A.2d 218 (D.C.1986) (citations omitted). In this case, however, we are satisfied that the court's questioning did no more than permissibly illuminate the wit-

nesses' testimony, *see Khaalis v. United States*, 408 A.2d 313 (D.C.1979), *cert. denied*, 444 U.S. 1092, 100 S.Ct. 1059, 62 L.Ed.2d 781 (1980), and in no way jeopardized appellant's presumption of innocence, *see Petway v. Jackson*, 391 A.2d 798, 799 (D.C.1978), or improperly suggested to the prosecutor tactics he had not considered, *see Robinson, supra*, 513 A.2d at 222.

### C. The government's rebuttal argument

During appellant's closing argument, defense counsel argued that Townes had received her injuries as the result of a fight she had with appellant. In rebuttal, the prosecutor argued:

> [T]hat sounds good that argument [defense counsel made] about the fight. But wait a minute. If this were the way [defense counsel] and Mr. Johnson wants you to believe, did you hear any evidence that this man was injured? Did you hear any medical evidence about his injuries? Only one person got injured. Only one person was beaten. Only one person had a black eye. It wasn't [appellant].

Appellant claims that this argument was an impermissible comment on appellant's failure to testify or produce evidence and that the trial court erred in failing to declare a mistrial or, at the very least, to give the jury a curative instruction as appellant had requested.

 A statement in the government's closing argument is improper if it is "of such character that the jury would naturally and necessarily take it to be a comment on [a defendant's] failure to testify." *Logan v. United States*, 489 A.2d 485, 490 (D.C.1985) (quoting *Byrd v. United States*, 364 A.2d 1215, 1218 (D.C.1976)). Such an improper comment in closing or rebuttal is one which raises questions for the jury that only the non-testifying defendant could have answered. *See Gray v.* *United States*, 589 A.2d 912, 917 (D.C. 1991); *Boyd v. United States*, 473 A.2d 828, 833 (D.C.1984). The prosecutor's rebuttal statement in this case was not of that quality. Appellant raised the issue of fight in his closing argument. The prosecutor's response in effect asked the jury to consider that there was no evidence of any injury sustained by appellant to support that inference. Such evidence could have come from a variety of sources other than appellant: Townes herself, a member of appellant's family, or a treating physician. *See Gray, supra*, 589 A.2d at 917. The prosecutor's statement in rebuttal, therefore, was a proper comment on appellant's closing argument; it was not "naturally and necessarily ... a comment on [appellant's] failure to testify." *Logan, supra*, 489 A.2d at 490. The trial court committed no error.

### D. The sentence

 Judge Walton presided at the three-day trial in February 1989. After Judge Walton resigned from the Superior Court on June 8, 1989, sentencing responsibilities were assigned to Judge Shuker, who imposed sentence on June 16, 1989. Appellant argues that Judge Shuker was inadequately informed of the facts of appellant's case to be able to perform his sentencing duties under Super.Ct.Crim.R. 25(b) and thus abused his discretion by failing to grant a new trial or to refer the case back to the Chief Judge.[4] Before imposing sentence, Judge Shuker assured appellant that he had read the presentence report and all the materials submitted by appellant, including letters from appellant and others; had considered appellant's lack of prior convictions other than one misdemeanor offense; and had conferred with Judge Walton about the jury's verdict. "A judge must be satisfied that he can sentence a defendant, despite his [or her] not

---

4. Super Ct.Crim.R. 25(b) provides:

 *After verdict or finding of guilt.* If by reason of absence, death, sickness or other disability the judge before whom the defendant has been tried is unable to perform the duties to be performed by the Court after a verdict or finding of guilt, any other judge regularly sitting in or assigned to the Court may perform those duties; but if that judge is satisfied that a judge who did not preside at trial cannot perform those duties or that it is appropriate for any other reason, that judge may grant a new trial or refer the case back to the Chief Judge.

having presided at trial...." *Gaffney v. United States*, 421 A.2d 924, 931 (D.C. 1980). Based on the record before us, we are satisfied that Judge Shuker was adequately informed of the facts of appellant's case and did not abuse his discretion in imposing sentence.

Appellant also argues Judge Shuker imposed sentence on the "unfounded assumption" that the complainant's skin was on the iron when he examined it along with all the other evidence. During his sentencing statement, Judge Shuker said: "And *among other things*, I looked at an iron that still has human flesh on it." Defense counsel immediately interrupted and informed the Judge that the parties had stipulated at trial that the material on the iron was not skin. Judge Shuker accepted the correction and went on to make clear that his sentencing decision was based on the serious nature of the assault and injury (as shown by photographs admitted into evidence), evidence of the complainant's "emotional scarring," and the need to protect the public, especially the complainant, from appellant. Based on the evidence and record in this case, we cannot say the factors on which Judge Shuker based his sentencing decision were unfounded.

## V.

Appellant contends that the evidence was insufficient as a matter of law to sustain his conviction for armed rape. To obtain a conviction for armed rape under D.C.Code § 22–3202(a) (1989 & 1991 Suppl.) the government must prove beyond a reasonable doubt that a defendant committed rape "when armed with or [when] having readily available any ... dangerous or deadly weapon." When "an instrument is not per se a dangerous weapon" the government must show something more than mere presence of a weapon to meet the "dangerous weapon" element of the crime. *Cooper v. United States*, 368 A.2d 554, 558 (D.C.1977). Townes' testimony about appellant's use of the hot iron that resulted in the serious burns to her chest and abdomen clearly shows appellant had established the iron as a dangerous weapon

before the rape. *Cf. Harris v. United States*, 333 A.2d 397 (D.C.1975) (imitation pistol is "dangerous weapon" when used as weapon in an assault).

Townes' testimony also showed, however, that appellant was not holding the iron at the time of the rape. The question, therefore, is whether there was sufficient evidence to show appellant committed the rape when he was "armed" or while having a dangerous weapon "readily available" within the meaning of § 22–3202(a). We believe the government satisfied its burden of proving the "armed" element by demonstrating that the coercive element of the sexual assault arose directly from appellant's use of a dangerous weapon: the iron.

In a case where the charge was assault with intent to commit rape while armed, we stated: "the assault with a dangerous weapon need not occur simultaneously with the events from which a jury could reasonably infer specific intent to rape," *Glascoe v. United States*, 514 A.2d 455 (D.C.1986), but our reasoning suggested there must be a close connection between the armed assault and the rape. For example, in *Glascoe*, the appellant held a gun to the complainant's back and forced her from the street to his house and into his bedroom. Once there, he put the gun on a dresser and attempted to force the complainant to have sex with him. *Id.* at 458–59. Similarly, in *White v. United States*, 484 A.2d 553 (D.C.1984), the evidence showed that appellant came up behind the complainant as she was entering her car, placed a gun to her head, shoved her into the car, then drove to a darkened area where he raped her. Although the primary issue on appeal was whether the identification evidence was sufficient to convict appellant for armed rape (as well as armed robbery and armed kidnapping), the court had no problem concluding that the circumstantial evidence was enough to find appellant guilty of all charged offenses. *Id.* at 556–57. In both of these cases, the assailant did not directly employ the weapon during the act of rape or attempted rape, but the assault with the dangerous weapon before the rape was the

force that coerced the complainant into sexual intercourse (or just short of it) against her will.

In *Boyd v. United States*, 473 A.2d 828 (D.C.1984), the government could not show by direct evidence that a dangerous weapon was employed during a rape attack. The complainant testified that she did not see or feel a dangerous weapon before or during the attack, but stated the appellant had "put," "kept," or "had" a knife at her throat and forced her to submit to sexual intercourse. We concluded that her testimony was sufficient for a reasonable juror reasonably to find that appellant had committed rape while armed. " 'It was enough that the [victim was] shown to have had at [the time of the rape] a reasonable belief induced by threats that [she] faced ... serious bodily harm' " from appellant's use of force. *Smith v. United States*, 363 A.2d 667, 669 (D.C.1976) (quoting *Arnold v. United States*, 358 A.2d 335, 340 (D.C. 1976)).

We believe the evidence was sufficient to show that Townes feared additional bodily harm if she refused to comply with appellant's orders to have sexual intercourse, and that appellant induced that fear through his use of the iron. According to Townes' testimony, after appellant had assaulted her with the hot iron, he placed the iron back on the ironing board near the bed. She immediately made two unsuccessful attempts to escape. Appellant ordered her back upstairs. Once there, appellant told her to take her pants off and get on the bed. She testified that she complied with appellant's orders because she was afraid he was going to hurt her again and that she was in great pain from the burn. Although appellant did not demand sex from Townes before or immediately after assaulting her with the iron, and did not reach for or mention the iron again, the iron remained on the ironing board near the bed during the sexual assault.

Based on this evidence, we think a reasonable juror could reasonably find that a direct consequence of appellant's assault with the iron was to coerce the complainant into having sexual intercourse. She testified that she complied with appellant's orders only because she was afraid and in pain. Appellant's assault with the iron was the direct cause of that fear and pain; it was the armed force that enabled appellant to threaten and terrify Ms. Townes into having sexual intercourse against her will. We therefore conclude the evidence was sufficient to sustain appellant's conviction for armed rape.

## VI.

A majority of the court for reasons stated in Judge Kern's opinion that follows rejects appellant's assertion that the evidence presented at trial was insufficient as a matter of law to sustain his conviction for burglary. Accordingly, all convictions are affirmed, except the conviction for assault with a dangerous weapon (*see supra* note 2), which we reverse and remand for entry of an order of dismissal.

*So ordered.*

KERN, Senior Judge, in which WAGNER, Associate Judge, concurs:

When the sufficiency of the evidence is challenged after conviction, this court has stated:

> [w]e will reverse a conviction only if there is *no* evidence upon which a reasonable mind could infer guilt beyond a reasonable doubt.

*Warrick v. United States*, 528 A.2d 438, 441 (D.C.1987) (emphasis added). In addition, we have also stated that in reviewing a claim of evidentiary insufficiency:

> [t]he evidence ... must be evaluated in the light most favorable to the government, making allowance for the factfinder's right to determine the credibility of witnesses and draw justifiable inferences from their testimony.... The fact that the case may rest on circumstantial evidence is of little consequence if that evidence is such that it may reasonably persuade the trier of fact beyond a reasonable doubt.

*Shelton v. United States*, 505 A.2d 767, 769 (D.C.1986) (citations omitted). Here,

we are confronted with appellant's claim that the evidence was insufficient to support the jury's verdict of guilty of burglary. Specifically, appellant argues that the evidence was insufficient to establish that he entered the home of the complaining witness with the specific intent to commit an offense (*i.e.*, assault). Viewing the evidence in the light most favorable to the government, we are satisfied that the evidence, both direct and circumstantial, together with the justifiable inferences, is sufficient to lead a reasonable juror to find beyond a reasonable doubt that appellant intended when he entered the house to assault Ms. Townes.

The evidence shows that it had been about a week to ten days since the complainant had seen appellant when he came to her home on the morning that the crimes were committed. Although the complainant had dated Johnson for six years, several weeks before, she told him that she did not want to see him again, and Johnson did not like this. Johnson was the dominant party in their relationship and he did not like her to have male friends. He was taller, heavier and stronger than she. The parties' relationship had been stormy. They engaged in public arguments numerous times, and, on one occasion, Johnson was observed carrying complainant from her home where she lived with her mother "in a headlock and kicking and screaming." Her mother had to call the police on this occasion.

The day before the burglary and assaults, Johnson spoke with Townes by telephone. Although she no longer liked him, she agreed to see him the next day at her home. Apparently, Johnson could not wait, and around one o'clock in the morning, he telephoned appellant's home twice. The complainant's mother, who was in bed, answered both times, but she refused to allow Johnson to speak with her daughter. Johnson used profanity when speaking with complainant's mother. The complainant's mother testified that appellant called over and over and that each time she hung up.

Appellant persisted in his effort to reach the complainant, and at two o'clock that same morning, he banged on the door of complainant's home "for awhile" and called out her name. Johnson left the complainant's front door, but he returned later, and knocked at the door again, and then blew the horn of his van "for quite awhile." Through all this commotion, the complainant did not come out of her bedroom.

About 7:00 a.m., the complainant's mother left for work, after locking all the doors. Johnson did not have a key to the house, but he knew that a window downstairs in a patio door had a broken pane of glass over which paper had been taped. Johnson also knew the time at which complainant's mother left for work.

After the complainant's mother left home, appellant knocked on the door again and called out the complainant's name. Still she did not answer his knock or open the door. The complainant was upstairs when she heard footsteps on the stairs, became frightened and hid in the back of a closet to avoid being seen from the hallway. Johnson found complainant and initially hugged and kissed her once, said he missed her, and asked her where had she had been. When she responded "nowhere," he accused her of lying, and she asked him to leave. While they were still in the closet, appellant struck the complainant, blackening her eye, and he poked her again and again with a sharp object. The complainant did not see where appellant obtained the sharp object. Then appellant burned the complainant's chest with a hot iron. She fled to the basement of her home, but Johnson followed her and directed her to go back upstairs and take off her clothes. It was then that he raped her.

Our decisions on sufficiency of the evidence in burglary cases say that "when the unauthorized presence is aided by *other circumstances*, such an inference [of criminal purpose at the time of entry] may be drawn." *Warrick, supra,* 528 A.2d at 442 (emphasis added). This court has purposely avoided narrowly defining these "other circumstances" as we prefer "to consider in each case whether the circumstances are such as 'might lead reasonable people, based on their common experience, to con-

clude beyond a reasonable doubt that appellant intended to commit some crime upon the premises.'" *Warrick, supra,* 528 A.2d at 442 (quoting *Shelton, supra,* 505 A.2d at 770).

The dissent's reliance on *Warrick, supra,* 528 A.2d at 441–42 *infra* at 902, is inappropriate. In that case, there was no evidence of "other circumstance" to support an inference that appellant intended at the time of his unlawful entry to stab the homeowner with a knife.

■ The record in the instant case, however, contains ample evidence of such "other circumstances" which when looked at in a light most favorable to the government and drawing justifiable inferences therefrom, we conclude a reasonable juror might find beyond a reasonable doubt that Johnson had the requisite intent to assault the victim when he entered her home without being given any authority to enter.

Specifically, the evidence of these "other circumstances" and inferences therefrom allowed the jurors to find that when appellant entered the victim's home without authority, he did so with aggressiveness and hostility. Such inferences may reasonably be drawn from the totality of the circumstances as shown by the evidence including: that appellant's prior relationship with the victim had been emotionally tempestuous and physically violent; that appellant was domineering and prone to jealousy; that the complainant broke off their relationship, and appellant did not like it; and, that he had engaged in hostile behavior toward the occupants of the home shortly before entering it without permission, *viz.,* repeatedly telephoning, cursing the victim's mother, banging on the door, calling her name and honking his horn outside her home at different times between one and two o'clock in the morning. The jury also heard how the victim refused to answer his knock on her door later that morning and could infer that such behavior angered appellant. In sum, the evidence of the *other circumstances* prior to unauthorized entry are more than ample to allow (but not require) reasonable jurors to decide that Johnson entered the victim's home with the intent to harm rather than love her.[1]

Furthermore, the evidence of appellant's actions once inside the premises provides additional circumstantial evidence of the intent with which he entered. The initial assaults occurred very quickly, before the complainant even got out of the closet. A jury could infer that the unwanted kiss that appellant gave to her immediately prior to the assaultive behavior, rather than intending to show tenderness and affection, was in actuality just another form of domination.

We disagree with the dissent, *infra* at 905, that there is no reliable evidence that appellant had a sharp object with which he poked the victim over and over. The victim testified at trial that though she could not see the sharp object, appellant kept poking her with it. From a photograph taken of her after the incident, she indicated at trial a red mark on her thigh caused by one of the pokes. The jury was free to believe her testimony and, despite the dissent's seeming willingness to second-guess the jury's credibility determination, we must look at the evidence in the light most favorable to the government.

When all these facts are considered with appellant's prior assaultive conduct toward complainant, his aggressive and hostile display at complainant's home in the early morning hours, and his entry without complainant's permission, the evidence is sufficient to allow reasonable jurors, based on their common experience, to find that appellant intended to assault the victim when he entered. *See Warrick, supra,* 528 A.2d at 442.

Finally, we note that as a matter of public policy, and particularly in light of

---

1. It is instructive, but not decisive of course, that the trial court denied appellant's post-judgment motion to vacate his sentence, rejecting appellant's bald assertion that he had entered complainant's home "with an innocent state of mind." Instead, the judge found that "the evidence is overwhelming ... that [appellant] entered complainant's home in a state of jealous agitation with specific intent to assault" the victim. *Id.* If the judge concluded thus upon the evidence, then surely jurors could reasonably reach the same conclusion.

society's evolving sensitivity to and growing awareness of the troublesome and extremely important issue of domestic violence, this court in a case such as this should be loath to substitute its own evaluation of the evidence for that of the jurors. They saw and heard the witnesses and their collective experiences and judgments are particularly adept in achieving justice.[2] Thus, we affirm the conviction of burglary.

FERREN, Associate Judge, concurring in part and dissenting in part:

I join the *per curiam* opinion except for Part VI.

In finding the evidence sufficient to convict appellant of burglary, the majority ignores the government's failure to establish a crucial element of the crime: that appellant had the specific intent, at the moment he entered Townes' home, to physically assault her. The majority fails to show how the government's evidence is sufficiently probative of that intent. Instead, the majority merely cites selective segments of testimony by Townes and her mother and says, summarily, that this testimony shows "other circumstances" sufficient to allow the jury to draw an inference of the required intent. *Ante* at 898–900. In this way, the majority has blurred the significant distinction between burglary and unlawful entry under our criminal law. Because we have the responsibility, on appellate review, to preserve such distinctions no matter how horrible the facts of a particular case may be, I must respectfully dissent from the court's opinion affirming appellant's burglary conviction. I would reverse on that count only and would remand for resentencing.

I.

D.C.Code § 22–1801 (1989) states: "Whoever shall ... break and enter, or enter without breaking, any dwelling ... with intent to ... commit any criminal offense, shall, if any person is in any part of such dwelling[,] ... be guilty of burglary in the first degree." The element that distinguishes burglary from the misdemeanor of unlawful entry is the specific intent at the time of entry to commit a crime when once inside the dwelling. *See* D.C.Code § 22–3102 (1989) (unlawful entry). "The gravity attached by the legislature to the additional mental element is reflected in the penalties which follow from a conviction. In the case of burglary, the maximum term of imprisonment is thirty years, sixty times the possible six month period triggered by a conviction for unlawful entry." *Shelton v. United States*, 505 A.2d 767, 769 (D.C. 1986).

Because of the extreme difference between the penalty for mere unlawful entry and the penalty for burglary (entry *plus* a specific intent to commit a crime inside), the government—to satisfy its burden of proof under the burglary statute—must show more than just entry and subsequent commission of a crime. *See Warrick v. United States*, 528 A.2d 438, 442 (D.C. 1987); *Parker v. United States*, 449 A.2d 1076, 1077 (D.C.1982); *see also United States v. Jeffries*, 45 F.R.D. 110, 112 (D.D.C.1968) (crucial element of burglary "is the specific intent which impelled the entry and not the lawful or unlawful manner of entry"). Put another way, evidence of the subsequent crime by itself does not support a finding of a criminal intent to commit that crime at the time of entry; otherwise, any time the government proved that a defendant committed a crime after

2. That a jury's collective knowledge and experiences combine to create a formidable body peculiarly qualified to render justice has long been acknowledged:

"Twelve men [and women] of the average of the community, comprising persons of education and persons of little education, men [and women] of learning and men [and women] whose learning consist only in what they have themselves seen and heard ... these sit together, consult, apply their separate experi-

ence of the affairs of life to the facts proven, and draw a unanimous conclusion. This average judgment thus given [ ] is the great effort of the law to obtain. It is assumed that twelve men [and women] know more of the common affairs of life than does one man [or woman], that they can draw wiser and safer conclusions from admitted facts thus occurring than can a single judge."

*Sioux City & Pac. R.R. v. Stout*, 84 U.S. (17 Wall.) 657, 664, 21 L.Ed. 745 (1873).

entry, the defendant would automatically be guilty of burglary as well as the subsequent offense. *See Shelton,* 505 A.2d 767, 770–71 (event leading to inference of criminal guilt did not occur until after entry and thus insufficient to prove burglary); W. LaFave & A. Scott, 2 Substantive Criminal Law § 8.13(e) at 473 (1986) ("If the actor when he was breaking and entering only intended to commit a simple trespass, he was not guilty of a burglary even though he in fact committed a felony after entering.").

The government, therefore, must "prove beyond a reasonable doubt that the defendant entered the premises having already formed an intent to commit a crime therein." *Warrick,* 528 A.2d at 442. "Unauthorized presence in another's premises does not alone support an inference of criminal purpose at the time of entry; but when the unauthorized presence is aided by other circumstances, such an inference may be drawn." *Id.; see Douglas v. United States,* 570 A.2d 772, 776 (D.C.1990). To prove burglary, therefore, the government's "other circumstances," *Warrick,* 528 A.2d at 442, must reasonably show that appellant's entry into Townes' home was a deliberate step in the commission of a crime—in this case, physical assault. *See* II Model Penal Code and Commentaries § 221.1 at 63; W. LaFave & A. Scott, Handbook on Criminal Law § 96 at 715 (1972). The circumstantial evidence of appellant's intent must be that "which might lead reasonable people, based upon their common experience, to conclude beyond a reasonable doubt that appellant intended to commit some crime upon the premises." *Shelton v. United States,* 505 A.2d at 770. If the government's evidence allowed a reasonable juror to find beyond a reasonable doubt that appellant had the specific intent at the time of entry to assault Townes, we must affirm his conviction of burglary.

## II.

"Other circumstances" giving rise to a reasonable inference of the necessary criminal intent include, for example, a forced entry and "unexplained presence in a darkened house," concealment while carrying criminal instruments, forced entry after breaking a window, or presence in a ransacked building. *Massey v. United States,* 320 A.2d 296, 299 (D.C.1974) (citing and quoting from cases). The government's mere recitation of circumstances surrounding entry is insufficient, however, if such circumstances are not probative of the defendant's state of mind at the time of entry. This is the majority's analytical failure in this case: it does not critically examine the probative value of the "other circumstances" it lists with respect to appellant's state of mind, not hours or days before the incident, but at the moment he entered the home. *See ante* at 899–900. The majority's approach thus greatly reduces the government's statutory burden of proving specific intent and is contrary to our approach in previous cases.

In *Warrick,* for example, the defendant entered a home without permission and subsequently stabbed the owner in the neck with a knife. Although we agreed with the government that there was enough evidence to infer the defendant entered the home while armed with a dangerous weapon, and that the evidence "might support an inference that he intended to use the weapon *if* somebody attempted to interfere with his taking of property," we concluded that a burglary conviction "may not rest on such an 'if'." *Warrick,* 528 A.2d at 442 & n. 4 (emphasis in original). Similarly, in a case where the evidence showed that two defendants engaged in surreptitious behavior before breaking into a basement and then left without taking anything—according to the government, because there was nothing in the basement "both small and valuable enough to steal"—we concluded that the evidence was insufficient to sustain a burglary conviction. *North v. United States,* 530 A.2d 1161, 1162–63 (D.C.1987).

In the present case, with respect to the intent element, the government argues that the jury could reasonably have inferred that appellant had entered the house either in a jealous rage from which the jury could reasonably find that he had entered with

the specific intent to harm Townes or, in the alternative, that appellant had entered with a conditional intent to assault Townes if "his suspicions went unassuaged when he found her." As we emphasized in *Warrick*, however, the inference a conditional intent might raise is not enough to sustain a conviction for burglary. *Cf. North*, 530 A.2d at 1162–63 (government's conditional inference that if something of value had been inside dwelling defendants would have committed theft insufficient to satisfy specific intent requirement of burglary). I therefore focus on the government's "jealous rage" theory.

A careful review of the evidence at trial leads me to conclude that a reasonable juror would have had to have a reasonable doubt that appellant entered Townes' home with a specific intent to assault her. The evidence showed that appellant and Townes had engaged in a "love-hate relationship" over a five or six year period. Townes testified that appellant had been in her house on "many, many occasions." Townes' mother, Ms. DaSilva, testified that on a few of those occasions appellant had carried Townes out of the house "in a headlock," "kicking and screaming." Although Townes had attempted to break-up several weeks before the assault, she testified that she had had consensual sex with appellant seven to ten days before the assault.

On January 27, 1988, appellant called Townes and asked to see her. She agreed to see him at her house the next day. Sometime around 1:30 a.m. on January 28, appellant called for Townes, but DaSilva answered the phone and hung up on him. DaSilva testified that appellant then called again and again and that each time she refused to let him speak to Townes and hung up. DaSilva stated that during at least one of these calls appellant used profanity. Appellant's profanity, however, was directed toward DaSilva, not Townes. About a half an hour after the last phone call, DaSilva heard appellant knocking on the front door and calling out Townes' name. Both DaSilva and Townes ignored appellant, and he soon left. Later, DaSilva heard another knock on the door and

looked out the window and saw appellant's van. Appellant returned to his van and blew his horn for "quite awhile" before leaving again. After DaSilva had left for work at about 8:30 a.m., appellant returned in accordance with the meeting time he and Townes had agreed upon the previous day. When no one answered—according to Townes' testimony—appellant called out her name and continued knocking on doors. When no one responded, he entered the house. There was no evidence of a forced or hostile entry. But there was evidence that appellant had entered the home many times before and that Townes' had told appellant a pane of glass missing from the back door allowed easy entry. Upon entering the house, appellant walked up the stairs and into Townes' bedroom.

After appellant entered the room and saw Townes in the closet, he hugged her, gave her one kiss, and told her that he missed her. Townes did not testify—and there is no evidence to suggest—that appellant's hug and kiss and initial statement constituted or suggested assaultive behavior in any way. Shortly after appellant told Townes that he missed her, he asked her where she had been. When she responded that she had not been anywhere, he told her that she was lying. According to Townes' testimony, at that point she began yelling at appellant and demanded that he leave. Appellant did not respond at first. He then asked her again where she had been and accused her of lying. It was only after they had been arguing that appellant struck and assaulted Townes.

The government's theory is that appellant entered the house in a jealous rage because: (1) Appellant and Townes had a love-hate relationship which Townes had attempted to end several weeks earlier; (2) Townes (and her mother) had refused to talk to or see him earlier that morning despite his repeated attempts; and (3) Townes did not let him in when he knocked on her door and called out her name at 8:30 a.m. From these circumstances the government asked the jury to infer that appellant had become enraged by the time he entered the house and had entered for the

purpose of assaulting Townes. The government's conclusion that appellant had intended to assault Townes from the moment he entered is therefore based on inferences drawn from the status of appellant's relationship with Townes on January 28, 1988 and the turbulent history of their relationship, from appellant's failed attempts to see or talk to Townes earlier in the morning, and from appellant's entering the house after no one answered the door.

Although it would be reasonable to infer that appellant was frustrated at the time he entered and that he very much wanted to speak to Townes, the government's evidence permits only speculation about whether appellant had already formed the criminal intent for assault at the time he entered the house. There was no evidence, for example, that appellant had threatened Townes during his attempts to contact her earlier in the morning, that he had called out to Townes in a threatening manner before or just after his entry, or that he had wanted to do anything more than question her about where she had been or patch-up things between them. The majority states, however—without any reference to the evidence—that "[t]he jury also heard how the victim [Townes] refused to answer his knock on her door later that morning and could infer that such behavior angered appellant." *Ante* at 900. If the majority is referring to appellant's knock on the door around 8:30 in the morning, then it is simply wrong. There was absolutely no evidence from which to infer that appellant was "angry" when no one answered the door for him at 8:30, the appointed time for their meeting. The majority has confused reasonable inference with sheer speculation.

Furthermore, according to Townes' testimony, before the assault appellant did not question her about that morning's events or about why she would not talk to or see him, and there was no evidence that appellant even knew for sure that Townes was in the house at the time he entered. Thus, there was no evidence linking appellant's

earlier behavior—critical to the government's jealous rage theory—to appellant's purpose for later entering the house. *Compare Williams v. United States*, 549 A.2d 328 (D.C.1988) (reasonable inference that appellant at time of entry intended to commit larceny based on evidence that appellant had entered same dwelling a week before and had committed larceny); *Douglas*, 570 A.2d at 776 (evidence that defendants cased store and remained in vicinity for over an hour before breaking-in sufficient to show intent to commit crime at time of entry); *Edelen v. United States*, 560 A.2d 527 (D.C.1989) (appellant who pulled gun and told complainant to open door of her apartment and thereafter raped her guilty of burglary in first degree); *Parker*, 449 A.2d at 1077 (evidence of defendant's pattern of theft sufficient for jury reasonably to infer intent to steal at time of entry).

It was only after some time had passed, an argument had ensued, and Townes had demanded that appellant leave that appellant committed the atrocious acts for which he was justly convicted. Although I agree with the implication of the majority's analysis that appellant's first acts upon seeing Townes after his entry, a hug and a kiss, are not *ipso facto* always a sign of affection and that in some circumstances a hug and a kiss could constitute a sexual assault, *see ante* at 899–900, 900, Townes' testimony was that appellant did not assault her until after the hug and kiss and the argument. As the majority recognizes, it was only after the hug and kiss, and *in response* to Townes' insistence that he leave, that appellant struck her in the face. *See ante* at 899. The government, therefore, presented no evidence that appellant's hug and kiss—his first acts upon seeing Townes—constituted assaultive behavior or indicated "jealous rage."

In summary, I do not see how any of the "other circumstances" the majority catalogs are probative of appellant's intent at the time he entered the home.[1] The cir-

---

1. Because my two colleagues conclude otherwise, I believe it is necessary to point out briefly other problems with their analysis of the evidence. First, I do not see the probative value of appellant's familiarity with the time Townes' mother left for work each morning. *See ante* at

cumstantial evidence only showed that appellant and Townes had been in a sometimes violent relationship, that appellant had been upset earlier that morning, that he returned to speak with Townes at their previously arranged meeting time, and that he entered the premises after no one answered the door. The "hostile" behavior and "anger" from which the majority says the jury could properly have inferred intent to assault, *see ante* at 899–900, arose hours before appellant's entry, were directed primarily at Townes' mother, were not accompanied by any threats, and were followed by acts immediately before and after his entrance (first knocking on the door and calling out Townes' name and then hugging and kissing Townes' and telling her that he missed her) which tended to show appellant did not possess an assaultive intent when he entered. Although appellant's subsequent acts were criminal and reprehensible, there was no evidence appellant entered the home with the specific intent to undertake them; rather, the evidence showed those acts were triggered by events that took place after appellant had already entered the home.

### III.

The majority correctly recites the law of burglary in this jurisdiction, emphasizing that when unauthorized presence "is aided by *other circumstances* such an inference [of criminal purpose at the time of entry] may be drawn." *Ante* at 899 (citing *Warrick*, 528 A.2d at 442 (emphasis and brackets in majority opinion)). The two primary cases on which both the majority and I rely

(*Warrick* and *Shelton*) make clear, however, that the government must do more than simply introduce into evidence all circumstances surrounding an unauthorized entry. In those two cases, the "other circumstances" cited by the government did not reasonably indicate an intent to commit a crime at the time of entry. *Warrick*, 528 A.2d at 442–43; *Shelton*, 505 A.2d at 770–71. Similarly, the "other circumstances" the majority cites do not reasonably show, beyond a reasonable doubt, that appellant intended, at the time of entry, to assault Townes. The majority in effect jettisons our caselaw and expands the criminal offense of burglary to make it indistinguishable from the lesser crime of illegal entry in a case such as this where appellant, subsequent to entry, committed a violent crime.

"The case for an independent burglary offense must rest on the gains that are perceived from aggravated grading of offenses that under ordinary circumstances would be punished adequately by other provisions of the Code." II MODEL PENAL CODE AND COMMENTARIES § 221.1 at 66. Without question, appellant is being "punished adequately" based on his convictions for armed rape and malicious disfigurement. Because the statutory punishment for burglary "is usually far greater than for most of the offenses which might actually be committed within the [dwelling]," this court should not seek to expand the scope of the crime of burglary, no matter how terrible the particular facts of a given case. W. LaFAVE & A. SCOTT, *supra*, at 716.[2]

---

899. Additionally, the majority states that appellant "poked [Townes] again and again with a sharp object" before he burned her with the iron. *Id.* at 899. There was not, however, any reliable evidence that appellant had a sharp object, and the medical evidence revealed nothing to indicate appellant had used a sharp object in the assault. Although the indictment alleged that appellant committed burglary by entering the dwelling armed with a knife, on cross-examination Townes admitted that she never saw a knife. In fact, the trial court granted appellant's motion for judgment of acquittal on an armed assault with a knife charge, concluding that "the jury would have to speculate" that appellant had a knife in his possession. Finally,

there simply was no evidence that appellant engaged in "hostile" or assaultive behavior directed toward Townes either before or during his entry of Townes' home, *see id.* at 900, or that his unauthorized presence was by forced entry.

2. Although I am in complete accord with the majority's policy goal of combatting domestic violence, *see ante* at 900, I do not see, and the majority fails to explain, how our awareness of and sensitivity to that chronic problem are relevant to the particular point in dispute: the specific intent requirement of burglary. As I note above, appellant has been sentenced appropriately for his crimes of sexual assault and violence.

I conclude, as this court did in *Warrick* and *Shelton*, that the government's evidence of appellant's specific intent at the time of entry required the jury "to cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation" and therefore was insufficient as a matter of law to convict appellant of the burglary charge. *Shelton*, 505 A.2d at 771; *see Warrick*, 528 A.2d at 442–43. Respectively, therefore, I dissent: the evidence was insufficient to convict appellant of burglary.