**Frederick Lee GRAY, Jr., Appellant,**

v.

**UNITED STATES, Appellee.**

No. 88–728.

District of Columbia Court of Appeals.

Argued Feb. 20, 1991.

Decided April 18, 1991.

---

**14.** Rule 11 permits "an award only of those expenses directly caused by the [offending] fil-

ing." *Cooter & Gell*, 110 S.Ct. at 2461.

Hiram Puig–Lugo, Public Defender Service, with whom James Klein and Page Kennedy, Public Defender Service, were on the brief, for appellant.

Frederick W. Yette, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher, Thomas C. Black, and Daniel M. Cisin, Asst. U.S. Attys., were on the brief, for appellee.

Before FERREN, BELSON and SCHWELB, Associate Judges.

FERREN, Associate Judge:

A jury convicted appellant of manslaughter while armed, D.C.Code §§ 22–2405, –3202 (1989), for strangling Damon Chase to death with a belt after a prolonged fist fight. Appellant was sentenced to prison for not fewer than seven nor more than twenty-one years. On appeal, he contends: (1) the trial court erred in refusing to permit appellant's trial counsel to impeach a government witness with a prior inconsistent statement, and (2) the prosecutor engaged in misconduct during closing and rebuttal arguments when he commented on appellant's failure to testify, shifted the burden of proof to the defense, and misstated medical testimony. We affirm.

## I. FACTS

According to appellant's written statement given to investigating detectives five hours after the incident,[1] appellant was sitting in his apartment with three others watching a football game. He had drunk three six-packs of beer by the time Chase entered the apartment "talking shit"[2] and telling appellant "he would whip my ass." Appellant told Chase to leave and said he did not fear Chase. Chase, he said, then "started swinging on me and hit me in the mouth." Appellant tackled Chase, threw him on the floor, began hitting him, and told Chase he "was going to kill him." Appellant described the remainder of the fight:

> I was on top of him hitting him, then he was on top of me hitting me, and then I flipped him back over and hit him some more. Then I took my belt from my pants and put it around his neck and started choking him. He started saying, "No," and then I let him go. I said to him that I was going to kill him today, and I meant to do it. I choked him some more and then I got off him and he was laying there. I then got off him."

George Nickens, who owned the apartment, died before trial. Defense counsel read into evidence Nickens' grand jury testimony, including the signed statement he had given to the police. That statement substantially corroborated appellant's statement: Nickens added that appellant held the belt around Chase's neck "from 5 to 10 minutes." Nickens also said that during the fight appellant was fighting for his life because "[i]f Chase had had the leverage on him, he'd have killed [appellant]."

According to Metropolitan Police Officers Beckwith and Williams, when they arrived appellant explained that Chase (who was on the floor motionless, his face turning blue) was not dead; he was only faking. Appellant grabbed Chase's feet and dragged the body across the floor attempting to revive Chase. When Chase did not recover, appellant became nervous, began pacing, and said: "Yeah. I killed him. I choked him."

Not surprisingly, appellant claimed self-defense, arguing that at the time appellant choked Chase, Chase still posed a threat from which appellant had to use deadly force to protect himself.

## II. REFUSAL TO PERMIT IMPEACHMENT WITH PRIOR INCONSISTENT STATEMENT

Appellant contends the trial court erred in precluding defense counsel from using a

---

1. Appellant exercised his right not to testify at trial. His prior statement was proffered by the government and admitted into evidence.

2. Appellant explained that he and Chase had been arguing earlier that day.

prior inconsistent statement to impeach the principal government witness, Thomas Frederick.[3] Frederick had known both Chase and appellant for a number of years. At trial, Frederick testified that he had opened the door and let Chase into Nickens' apartment. Chase then told Delores Henry (the other visitor in the apartment) that she had a phone call at another apartment in the complex. Frederick returned to the kitchen and heard (but did not see) Chase and appellant arguing and beginning to fight. Frederick watched the last part of the fight from the kitchen. Frederick testified that he had drunk a "half pint" and some beer that afternoon and that his drinking impaired his memory of the fight.

Defense counsel perceived that Frederick's testimony contradicted a written statement he had given to the police the day of the fight. In that statement,[4] Frederick declared that Chase had come to the apartment to challenge appellant to fight, not to tell Henry she had a phone call. In the statement, moreover, Frederick described Chase as a "pain in the ass" and claimed—in contrast with his trial testimony—that he had been present when the fight started.

At trial, counsel attempted to impeach Frederick with this written statement. Frederick remembered making the statement but could not recall what he had told the police or whether he had signed the statement. Counsel attempted—but failed—to refresh Frederick's memory with the statement.

Appellant's counsel then tried to call as a witness the detective who had taken Frederick's statement, but the trial court denied permission to do so. The court did so because Frederick "didn't remember anything he told the police in that statement, and he didn't know anything more about how the fight started than he testified on direct, and ... indeed, he had been drinking, which leaves serious doubts respecting whatever it was he told the police in that

statement is accurate or true." The trial court also refused to admit Frederick's statement into evidence.

■ We agree with appellant that the trial court erred in refusing to permit the proffered impeachment and the extrinsic evidence of Frederick's prior statement. We note, first, that as a general proposition prior inconsistent statements are admissible, upon request, for purposes of impeachment (but not for the truth of the statement itself). *See Jefferson v. United States*, 328 A.2d 85, 86 n. 6 (D.C.1974); *Williams v. United States*, 131 U.S.App. D.C. 153, 156, 403 F.2d 176, 179 (1968). We have held in a civil case, moreover, that the statement is admissible for impeachment even if the witness does not recall making the statement or remember its contents. *See Fireman's Ins. Co. v. Henry Fuel Co.*, 245 A.2d 127, 128 (D.C.1968). We perceive no basis for a different rule in criminal proceedings. In either context, if a witness might be impeached by a prior statement he does recall, that witness should not be able to avoid the impeachment simply because he cannot remember (or perhaps chooses not to remember) his prior testimony. Commenting on a witness who purportedly failed to remember his deposition testimony, we have said:

> [W]hen the witness denies giving the answer, or does not remember doing so and his recollection is not refreshed upon the reading of the questions and his answers, the deposition should be offered and received as evidence that the statements were made, again only to affect credibility and not as affirmative evidence.

*Id.* at 128 (footnote omitted). That rule should apply in all cases, civil and criminal, with respect to all prior inconsistent statements, whether depositions, statements to the police, or other earlier utterances.

The trial court accordingly erred in ruling Frederick's prior statement inadmissible for impeachment. We now determine

---

**3.** Appellant's name is Frederick Gray. All references to "Frederick" in this opinion are to the government's witness, Thomas Frederick.

**4.** Frederick's written statement is not in the record on appeal. The trial court summarized it, however, during a bench conference with counsel at trial and in this way preserved the statement for the record.

whether the error was harmless. *See Jefferson,* 328 A.2d at 86 n. 5. Appellant argues the error could not have been harmless: if the jury believed Frederick's unimpeached trial testimony—that Chase entered the apartment as a benign visitor summoning Henry for a phone call—the jury would not have accepted appellant's self-defense claim. We cannot accept that argument.

The ultimate issue is whether appellant acted with reasonable force approximately thirty minutes after Chase had entered the apartment, *i.e.* at the time, after a prolonged fistfight, when appellant took off his belt and choked Chase to death over a period of five to seven minutes. Frederick's apparent inconsistencies about Chase's entry into the apartment did not directly pertain to this crucial time. The possibility that Chase did not come to the apartment as a benign visitor may have enhanced appellant's claim that he responded to Chase initially in self-defense and, in Nickens' words, "was fighting for his life." But even if Chase entered the apartment in a threatening manner and started the fight—as Nickens and appellant himself stated without contradiction—this does not necessarily imply that appellant was still acting in self-defense thirty minutes later, when appellant killed Chase. Any impeachment discrediting Frederick's "benign visitor" testimony, while reinforcing Nickens' and appellant's statements, was only marginally relevant to the issue of self-defense later, when appellant choked Chase over a substantial period of time. At that time appellant was clearly in control of the situation and appeared not to be in imminent danger. By his own admission, after he started to choke Chase and Chase exclaimed "No," appellant "let him go." But

then appellant told Chase he "was going to kill him today" and "choke him some more" —to death.

Furthermore, Frederick's unimpeached trial testimony was not inconsistent with appellant's self-defense theory. Even if the jury credited Frederick's testimony— that Chase had entered the apartment as a benign visitor—Chase still could have started the fight later by throwing a punch at appellant (as both Nickens and appellant said Chase did) and thereby triggered appellant's right of self-defense.[5]

In sum, the court's error was harmless because the proffered inconsistencies did not relate to the crucial time during the fight or otherwise substantially affect appellant's claim of self-defense.

### III. PROSECUTORIAL MISCONDUCT

■ Appellant also contends the prosecutor tainted the verdict with impermissible comments during closing and rebuttal arguments. In reviewing alleged prosecutorial misconduct, we first must determine whether the prosecutor's words or actions constituted misconduct. *See Hammill v. United States,* 498 A.2d 551, 554 (D.C. 1985); *Sherrod v. United States,* 478 A.2d 644, 655 (D.C.1984). If misconduct has occurred, we test for reversible error by considering "the gravity of the misconduct, its relationship to the issue of guilt, the effect of any corrective action by the trial judge, and the strength of the government's case." *Dixon v. United States,* 565 A.2d 72, 75 (D.C.1989).

### A. *Prosecutor's Comments on Appellant's Failure to Testify*

■ In closing, the prosecutor asked:

---

**5.** Defense counsel did use the prior statement, during cross examination, to question Frederick about his testimony. The jury heard Frederick's alleged statements to the police that Chase had come into the apartment and challenged appellant to a fight, and that Frederick had seen the beginning of the fight. The jury, therefore, at least became aware of Frederick's possible inconsistencies.

This is not a case, however, in which the prior statement itself was before the fact-finder, even though not formally admitted in evidence. *See*

*Fireman's Ins. Co.,* 245 A.2d at 128. Nor is it a case in which counsel effectively used the statement on cross-examination to persuade the witness to change his testimony, although the trial court refused to admit the document for inspection in the jury room. *See Jefferson,* 328 A.2d at 86. Because the trial court ruled the statement inadmissible, and because the jury's awareness of it was indirect and incomplete, we do not impute any significance to the jury's knowledge of Frederick's prior statement for harmless error purposes.

[W]here are the facts that showed that at that time, Frederick Gray actually believed he was in danger of death or serious bodily harm? Where is that evidence? Where is the evidence that that was reasonable? And where is the evidence that showed he had to take his belt off and crush Damon Chase's throat?

And in rebuttal the prosecutor stressed: [W]here is the evidence that at the point in this fight, where Frederick Gray was sitting on Damon Chase's back on the ground that Frederick Gray actually felt himself in fear of death or serious bodily injury, that that was reasonable at that point and that he has to kill to protect himself at that point.... There wasn't one word about that.

The trial court overruled defense counsel's objections to these statements.

■ Appellant contends the prosecutor improperly commented on appellant's failure to testify. Appellant acknowledges that these comments do not expressly refer to his failure to testify. He relies, however, on *Logan v. United States,* 489 A.2d 485 (D.C.1985), where we noted that a statement is improper if it is "of such character that the jury would naturally and necessarily take it to be a comment on the failure to testify." *Id.* at 490 (citation omitted). We have also explained that a comment "naturally and necessarily" highlights a defendant's silence when the defendant's trial testimony is the only source of an answer to the prosecutor's question. *See Boyd v. United States,* 473 A.2d 828, 833 (D.C.1984).

Appellant argues that the prosecutor's comments about what appellant "actually believed" and "actually felt" when he was choking Chase "naturally and necessarily" implicated his failure to testify at trial. Appellant stresses that he was the only person who could have provided this information. This argument is unconvincing. We do not attach the most sinister possible interpretation to a prosecutor's remarks, particularly when evidence of an intended impropriety is lacking (as in this case). *Donnelly v. DeChristoforo,* 416 U.S. 637, 643–44, 94 S.Ct. 1868, 1871–72, 40 L.Ed.2d

431 (1974); *Irick v. United States,* 565 A.2d 26, 33 (D.C.1989). Even if appellant is correct, that only his testimony could provide the answers to the prosecutor's questions, the prosecutor could have been referring to appellant's statement to the police which was admitted as substantive evidence. See *supra* note 1. Thus, the prosecutor's statements, at worst, reflected on the evidence that appellant had not mentioned in his sworn statement to the police that he actually had felt or believed his life was in danger when he was choking Chase.

■ Moreover, appellant's own statement was not the only source of evidence on the question whether, subjectively, appellant feared imminent serious bodily injury. On occasion, a defendant's subjective belief of danger can be determined from the objective circumstances of the killing. *See Fersner v. United States,* 482 A.2d 387, 392–93 (D.C.1984). It is possible, therefore, for a defendant to rely on self-defense, based on circumstantial evidence of reasonable fear of imminent serious bodily injury, without the defendant's own testimony. *See Reid v. United States,* 581 A.2d 359, 367 (D.C.1990); *Bowler v. United States,* 480 A.2d 678, 681 (D.C.1984).

In this case, the jury heard two eyewitness accounts of the fight—Frederick's trial testimony and Nickens' signed statement—as well as appellant's own statement. The prosecutor's comments in closing and on rebuttal, therefore, may be viewed as comments on the failure of the defense in general to demonstrate any basis for believing appellant actually felt or believed he was in imminent danger of bodily harm justifying deadly force in response. The prosecutor's comments did not naturally and necessarily implicate defendant's failure to testify.

### B. *Shifting Burden of Proof*

Similarly unavailing is the contention that these same comments by the prosecutor, questioning "where is the evidence?" to show appellant was in fear, improperly shifted the burden of proof of self-defense to appellant. We must evaluate the prosecutor's statements in context, considering

the effects of the trial court's corrective action, if any, *see Irick*, 565 A.2d at 32, and keeping in mind that the court's instructions presumably carry greater weight with the jury than the prosecutor's statements about the law. *See Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 1200, 108 L.Ed.2d 316 (1990).

 We have said that, "once raised, self-defense is an element of homicide that must be disproved by the government beyond a reasonable doubt." *Davis v. United States*, 510 A.2d 1051, 1053 (D.C.1986) (citations omitted). The trial court properly instructed the jury on the defendant's right to testify—or not to testify—and on self-defense.[6] The trial court also instructed the jury that counsel's statements in closing were not evidence. Juries are presumed to follow the trial court's instructions. *See, e.g., Coates v. United States*, 558 A.2d 1148, 1150 (D.C.1989). We will not upset the verdict by assuming the jury declined to do so. *Dixon*, 565 A.2d at 79 (quoting *Graham v. United States*, 231 U.S. 474, 481, 34 S.Ct. 148, 151, 58 L.Ed. 319 (1913)). Even assuming for the sake of argument that there may have been some possibility that the prosecutor's questioning ("where's the evidence?") momentarily confused the jury concerning appellant's burden to produce evidence of self-defense—a burden he does not have—we are satisfied that the trial court's instructions, coupled with the weight of the government's evidence, cured any possible prejudice.

### C. *Comments on Physical Evidence*

 Finally, we turn to appellant's contention that the prosecutor improperly tainted the verdict when he repeatedly misstated the evidence of Chase's physical condition. We do not believe the prosecutor misstated evidence.

The prosecutor attempted to undermine appellant's claim of self-defense by arguing, in closing, that Chase's heart condition and brain swelling prevented Chase from inflicting serious injury or death on appellant. The prosecutor based these comments on evidence of record. Dr. Comparini testified that Chase had a very damaged heart and, as a consequence, could not perform as well as someone with a normal heart. Dr. Comparini also testified that Chase's brain had swelled, either from blows to the head or from lack of oxygen. She further testified that she could not pinpoint the precise moment when the swelling occurred, but she concluded that blows to Chase's head during the fight could have caused some of the swelling.

Given this medical testimony, "we do not discern anything in the remarks challenged by the defense which goes beyond reasonable (though perhaps partisan) inferences from the evidence. The judge's routine instruction to the jurors that their recollection controls was, in our view, sufficient to remedy any arguable overstatement." *Dixon*, 565 A.2d at 79 (footnote omitted).

*Affirmed.*

---

**6.** The trial court gave the following instructions: Criminal Jury Instructions for the District of Columbia, No. 2.08 (3d ed. 1978) (burden of proof); *id.* No. 2.26 (defendant's right not to testify); *id.* No. 5.13 (self-defense).