**Percy JORDAN, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 07–CF–340.

District of Columbia Court of Appeals.

Argued March 10, 2011.
Decided March 31, 2011.

Patrick T. Hand, Washington, DC, appointed by the court, for appellant.

Leslie Ann Gerardo, Assistant United States Attorney, with whom Ronald C. Machen, Jr., United States Attorney, Elizabeth Trosman, John P. Mannarino, and Amanda Haines, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER and OBERLY, Associate Judges, and FERREN, Senior Judge.

FERREN, Senior Judge:

Percy Jordan appeals his convictions for first-degree murder while armed/felony murder (with aggravating circumstances),[1] second-degree murder while armed,[2] robbery of a senior citizen,[3] conspiracy to commit robbery,[4] and five counts of credit card fraud.[5] He argues that the trial court erred by (1) declining, in response to a note from the jury, to answer its question whether the word "cause" in the first-degree murder instruction meant "physically striking" the victim; (2) limiting cross-examination of the only eyewitness; (3) overruling the defense objection that the prosecutor's closing argument impermissibly shifted the burden of proof; and (4) denying the defense motion to strike appellant's "alias" from the indictment.[6] None of these arguments has merit and thus we affirm appellant's convictions, subject to remand for amendment of the judgment and commitment order to account for merged offenses.[7]

## I.

The charges against appellant grew out of the robbery and murder of David Rosenbaum. According to the government's evidence, on January 6, 2006, Rosenbaum left his house in Northwest D.C. to take a walk after dinner. At the time, appellant and his cousin, Michael Hamlin, were driving around nearby in Hamlin's car. As they were driving, appellant—who had with him a foot-long, hard, black plastic pipe—said, "Let's go get someone," which Hamlin understood to mean rob someone. Hamlin parked the car on Gramercy Street at 38th Street, N.W. At that point they spotted Rosen-

1. D.C.Code §§ 22–2101, –2104.01(b)(8), –4502 (sentenced to 660 months in prison, to run concurrently with the sentence for second-degree murder while armed).

2. D.C.Code §§ 22–2103, –4502 (sentenced to 240 months, to run concurrently with the sentence for first-degree felony murder while armed).

3. D.C.Code §§ 22–2801(a), –3601 (sentenced to 78 months, to run consecutively to all other counts).

4. D.C.Code § 22–2801 (sentenced to 12 months, to run consecutively to all other counts).

5. D.C.Code § 22–3223(d)(2) (sentenced to 180 days on each count, to run consecutively to each other and to all other counts).

6. Appellant also argues—and the government agrees—that his convictions for felony murder and second-degree murder merge, *see* *Thacker v. United States*, 599 A.2d 52, 63 (D.C.1991), as do his convictions for felony murder and robbery. *See Page v. United States*, 715 A.2d 890, 894 n. 6 (D.C.1998).

7. See *supra* note 6. Appellant also was charged with several other counts pertaining to alleged robberies of James Rose and Marion Dirda. These counts were severed from this case at a pretrial hearing.

baum, who was wearing headphones, walking alone down the street.

Hamlin and appellant then moved the car to the other side of the street. Appellant got out and ducked behind a tree along Rosenbaum's path. As Rosenbaum passed the tree, appellant jumped out and struck him in the head and waist with the pipe. Rosenbaum fell. Hamlin ran over and took the wallet from Rosenbaum's back pocket. The wallet contained $265 to $275 in cash, as well as credit cards, bank cards, a debit card, and a driver's license. Appellant and Hamlin then drove to an Exxon station on Connecticut Avenue, N.W., where Hamlin used a Rosenbaum credit card to fill up the gas tank while appellant went inside the convenience store to buy snacks. They later used Rosenbaum's credit card to purchase items at a CVS store and a Safeway, both in Southeast D.C. Rosenbaum died two days later on January 8, 2006. The physical strike to his head had caused a blood clot, which in turn caused his brain to swell.

The government established its case against appellant primarily through Michael Hamlin's testimony. Hamlin had turned himself in to the police shortly after the robbery upon learning that Rosenbaum had died from his injuries. During his initial interrogation, Hamlin told homicide detectives three false accounts of what had happened on January 6 before finally admitting his role in Rosenbaum's assault. Hamlin eventually pleaded guilty to second-degree murder, robbery, and conspiracy to commit robbery. As part of his plea agreement, Hamlin testified on behalf of the government and implicated appellant as the person who had physically struck Rosenbaum during the robbery.

In addition to Hamlin's testimony, a friend of appellant, John Snowden, testified for the government about a conversation he had had with appellant on January 11, 2006, five days after the incident. Snowden testified that appellant had told him that "if his cousin Mike say something he'd be gone a long time." Appellant went on to say "something about a credit card and a bank card," and added that he and Hamlin had "caught a cracker sleeping," which meant, according to Snowden, that they had caught a white person who did not know what was about to happen to him.

Appellant's defense theory was that Hamlin, not appellant, had attacked Rosenbaum, and that Hamlin was lying to avoid a longer prison sentence. The defense, therefore, focused on Hamlin's credibility. The only defense witness was Detective Edward Truesdale of the Metropolitan Police Department. Detective Truesdale testified that Hamlin had given changing versions of his involvement in Rosenbaum's death. Defense counsel tried to elicit that Truesdale had been the one who suggested to Hamlin that his cousin (appellant) had instigated the robbery. Although Hamlin, during cross-examination, had admitted that Detective Truesdale had suggested as much, the detective himself testified that he did not remember asking a question that would have suggested that Hamlin should implicate his cousin.

## II.

■ Appellant contends that the trial court erred by refusing to answer a question from the jury during its deliberations. With respect to the principal charge, first-degree murder while armed/felony murder (with aggravating circumstances), the court instructed the jury with the elements of the offense, the first of which was the required finding that "the defendant caused the death of the decedent, David Rosenbaum." The court added:

A person causes the death of another person if his actions are a substantial factor in bringing about death and if death is a reasonably foreseeable consequence of his actions. Death is reasonably foreseeable if it is something which should have been foreseen as being reasonably related to the defendant's actions.

On the second day of deliberations, the jury sent a note to the court asking two questions:

"Question Number One: Does cause as set forth in the first element of the first degree murder charge mean physically striking the victim? Question Number Two: Does the definition of causation on page 36 of the final instructions apply to both first and second degree murder?"

Defense counsel asked the court to answer "yes" to the first question because a physical striking was "the only evidence that's presented"; that is, the jury could not find that appellant had caused Rosenbaum's death in any way other than by striking him. The government argued, to the contrary, that the jurors might have a different line of thinking; they might believe that appellant had struck Rosenbaum, but that his doing so had not been "a substantial factor in bringing about his death."[8]

The trial court declined to answer the jury's first question: "I think that's for the jury to determine. I'm not going to set forth what facts they should find." The court therefore responded to the jury: "With respect to the first question, the first element states that the defendant caused the death of the decedent David Rosenbaum. It is your duty to determine whether the defendant caused the death of David Rosenbaum."[9] The court, we believe, made a sustainable call.

■■■ "Decisions regarding reinstruction of a jury are committed to the discretion of the trial court; absent abuse of that discretion we will not reverse."[10] That said, we have emphasized that "when a jury sends a note indicating its confusion with the law governing its deliberations, the trial court must not allow that confusion to persist; it must respond appropriately."[11] On the other hand, the court "is not required to respond to every inquiry from the jury."[12] If the jury's question focuses not on what the law means but on how the law should be applied to the facts, the court should not answer beyond reference to the initial instruction, lest the answer invade the jury's province as factfinder and, as a result, coerce the verdict.[13]

---

**8.** The defense offered no evidence or argument at trial that there may have been an intervening cause of Rosenbaum's death after he had been struck with the pipe that would have exonerated appellant from criminal responsibility.

**9.** The court answered "yes" to the second question, not at issue here.

**10.** *Davis v. United States*, 510 A.2d 1051, 1052 (D.C.1986) (per curiam) (citations omitted).

**11.** *Cox v. United States*, 999 A.2d 63, 70–71 (D.C.2010) (citations and internal quotation marks omitted) (reversing conviction for armed offense because of trial court's failure, in response to jury's note, to reinstruct "with 'concrete accuracy' on the specialized legal meaning of 'readily available'" weapon); *accord Preacher v. United States*, 934 A.2d 363, 368–70 (D.C.2007) (reversing convictions for manslaughter while armed and carrying a dangerous weapon because of trial court's refusal, upon request from jury, to define "assault," as used in the self-defense instruction).

**12.** *Murchison v. United States*, 486 A.2d 77, 83 (D.C.1984) (citation omitted).

**13.** *See Graham v. United States*, 703 A.2d 825, 832 (D.C.1997) ("Because the trial court had already provided instructions regarding [the legal issue], and because of the trial court's concern that it not dictate the outcome of the case, we cannot say the court abused its discretion by" declining to provide any reinstruction.).

The distinction between a jury's inquiry that reflects confusion about the law, and one that seeks help in applying clear-enough law to the facts, is not always easy to assess.[14] While recognizing that difficulty, appellant urges us to agree with him that our *Cox* and *Preacher* decisions[15] fit the circumstances here. In *Cox*, the defendant was charged with carrying a pistol without a license and possession with intent to distribute cocaine while armed. The court's initial instruction discussing the "while armed" element merely said that the jury had to determine whether Cox "was armed with or had readily available a pistol," without defining terms.[16] In its note to the court, the jury asked whether the term "readily available" meant "easily accessible or ha[d] anything to do with knowledge."[17] The trial court declined to answer and told the jury to give the words their ordinary meaning. Similarly, in *Preacher*, where the defendant was charged with manslaughter, the jury asked the court for the legal definition of "assault" after that word had been used in the instruction for self-defense.[18] The trial court refused to supply the definition.[19] In both cases, we reversed the convictions because the trial court had erred in failing to clear up jury confusion about the meaning of terms in the governing law.

*Cox* and *Preacher* do not govern this case. It may appear, initially, that the jurors were asking for nothing more than clarification of legal language (the meaning of "cause"). But whether they knew so or not, they were asking the judge—as he himself recognized—to do a job for them as fact-finder. The only evidence before the jury reflecting a "cause" of death was Rosenbaum's beating with a pipe. Had the judge answered "yes"—"cause" means "physically striking a victim"—the judge would have all but told the jury that if it were to find that appellant had struck Rosenbaum, then ipso facto he caused the man's death. Furthermore, in *Cox* and *Preacher*, the initial instructions did not define the legal terms the jurors inquired about, whereas the jurors here had received a comprehensive definition of "cause," uncontested at trial. They could have had little, if any, doubt, therefore, that a "physical striking" was a "substantial factor" that could satisfy "cause" of death. On this record, the jury's note cannot reasonably be taken as evidence of meaningful jury confusion.

One may wonder how a "yes" answer would have helped appellant's cause if—as appellate counsel conceded at oral argument—the answer would have told the jury that, upon finding that appellant had struck Rosenbaum, he had caused Rosenbaum's death. In his reply brief, appellant argues that by refusing to answer "yes" in response to the jury's question, "the trial

---

14. Occasionally, too, other situations call for reinstruction upon request. *See, e.g., Whitaker v. United States*, 617 A.2d 499, 502 (D.C. 1992) (reversing conviction for armed offense because of trial court's refusal to reinstruct on relationship between two charged crimes when "jury indicated in successive notes to judge that it was ready to return a verdict that would be logically irreconcilable with his instructions" and with other charged offense); *Potter v. United States*, 534 A.2d 943, 946 (D.C.1987) (reversing conviction for possession of a prohibited weapon with intent to use it unlawfully, when trial court refused to answer jury's note on whether self-defense instruction applied to that charge, in addition to the assault charge).

15. See *supra* note 11.

16. *Cox, supra* note 11, 999 A.2d at 70.

17. *Id.*

18. *Preacher, supra* note 11, 934 A.2d at 366–67.

19. *Id.* at 367.

court allowed the jury to return a verdict of guilty on the murder charges on a finding that appellant did something other than striking Rosenbaum, such as by merely being present at the scene." At oral argument counsel added that, by answering a simple "yes" to the jury's second question,[20] the court implied that the unstated answer to the first question was "no," suggesting that some other cause of death could be found. That understanding was reinforced, he said, by Hamlin's plea agreement, which could have caused the jury to believe that he, as an admitted liar, had been the one who struck Rosenbaum. Accordingly, stresses counsel, absent a trial court answer that a physical strike was essential to establish guilt, conviction might have rested on appellant's mere association with Hamlin in the assault.

■ Convincing as appellant's argument may seem, his associational theory is grounded on a misguided premise; the jury did not receive an instruction permitting conviction for aiding and abetting—for merely associating with—the confederate who struck the decedent.[21] The government relied exclusively on its charge and evidence that appellant was the principal, the person who struck Rosenbaum. The jurors are presumed to follow the trial court's instructions[22] and thus had no basis for convicting on the alternative theory that counsel speculates they might have applied. Therefore, even if the jury's question could be understood to indicate that one or more jurors might have been wondering about an alternate legal theory for finding guilt or innocence, they were not given one to consider. They were bound, accordingly, to use their best judgment in light of the instruction on causation that called upon them to determine whether appellant's actions—as evidenced primarily by Hamlin's testimony that appellant had struck Rosenbaum—were a "substantial factor" in bringing about his death. They presumably did so, apparently believing Hamlin despite the evidence of his dissembling.

But even if some of the jurors, despite the lack of an aiding-and-abetting instruction, were struggling because of a perception that Hamlin was the more likely striker, our case law supports the trial court's decision not to answer the jury's first question. The simple "yes" response that counsel asked for would have come close to a directed verdict on the facts of this case. In *Graham v. United States*,[23] the jury asked for clarification of the instructions on first- and second-degree murder and aiding and abetting. Its note to the judge during deliberations asked whether, if the jury believed that the co-defendant committed first-degree murder while armed, and that the defendant aided and abetted him but did not know or suspect that the co-defendant had the intent to kill, was it "necessary" to find the defendant guilty of the murder, or was it "possible" to find him guilty of second-degree murder while armed?[24] The trial judge declined to answer, other than asking the jury to listen

---

20. See *supra* note 8.

21. The government initially asked for an aiding-and-abetting instruction but dropped the matter after the defense objected: "But that's not the evidence they've presented, your Honor. That would require the jury to create a factual scenario that's not the Government's theory of the case. And then convict on that factual scenario.... You can't have a man prosecuted under a specific theory and then a jury instructed under a different theory."

22. See *Gray v. United States*, 589 A.2d 912, 918 (D.C.1991).

23. See *supra* note 13.

24. *Graham, supra* note 13, 703 A.2d at 831 n. 9.

again to the initial, tape-recorded instructions and to "feel free" to ask further questions after doing so (none was forthcoming). He told counsel: the jurors' "question[s] [are] so specific that I fear if I give a yes or a no answer, it virtually commands their verdict."[25]

We sustained the ruling. "Because the trial court had already provided instructions regarding [the legal terms], and because of the trial court's concern that it not dictate the outcome of the case, we cannot say the court abused its discretion by responding to the note" as it did.[26] As indicated earlier, these two rationales apply here. Whatever confusion about "cause" of death may have remained after the court's initial instructions, it was at most a minimal, legally insignificant residue after we take into account the evidence at trial, the uncontested general instructions on "cause," and the danger that an answer to the jury's question would have placed the trial judge himself in the jury box. There was no abuse of discretion here.

### III.

Jordan argues next that the trial court erred by overly restricting his cross-examination of Michael Hamlin. First, counsel was not permitted to question Hamlin about a statement he had given in an earlier, unrelated prosecution in Maryland—a statement similar to one of the false statements he gave to the police in this case. Second, counsel was not permitted to read into evidence a statement to Hamlin by a police detective during Hamlin's interrogation.

### A.

■ As to the first, defense counsel moved *in limine* for a ruling that would permit him to cross-examine Hamlin about the Maryland testimony, which he had given pursuant to a plea agreement. In Maryland, he testified that he had been driving in a car with his co-defendant; that the co-defendant had left the car to urinate; and that the co-defendant had then robbed someone. One of Hamlin's statements to the police in the present case, which he soon admitted was false, was nearly identical to the Maryland testimony. The trial court rejected the proposed cross-examination, however, on the ground that it would confuse the jury because it involved an unrelated case.[27]

■■ A defendant's Sixth Amendment right to confront adverse witnesses necessarily includes the right to cross-examine.[28] The trial court, however, retains discretion to impose reasonable limits, and the Sixth Amendment will be violated only when the court precludes a "meaningful degree of cross-examination."[29] A trial court, for example, "may always limit cross-examination to preclude repetitive and unduly harassing interrogations or to prevent inquiry into matters having little relevance or probative value to the issues raised at trial."[30]

25. *Id.* at 832.

26. *Id.*

27. Defense counsel was permitted, however, to cross-examine Hamlin on the existence of this prior conviction and on the resulting lesser sentence he had received because of his cooperation with the government.

28. *Grayton v. United States,* 745 A.2d 274, 279 (D.C.2000) (citations omitted).

29. *Flores v. United States,* 698 A.2d 474, 479 (D.C.1997).

30. *Brown v. United States,* 952 A.2d 942, 947 (D.C.2008) (citations omitted).

Counsel argues that the trial court's exclusion of Hamlin's testimony in the Maryland case "deprived Appellant of an opportunity to show that Michael Hamlin would say anything to avoid or limit prosecution, including lying to the police." We understand the concern. Appellant wanted to pound home to the jury that Hamlin was a congenital liar. The opportunity to demonstrate that, in an earlier case, Hamlin had testified about participating in a "urinating assailant" scenario, virtually identical to one of the stories he had told the police in this case, seemed almost heaven-sent; it was evidence that Hamlin appeared to carry creative, ready-made—and thus implicitly false—stories when called upon to testify against a confederate in crime.

That said, appellant had significant opportunity to cross-examine, and confirm without question, that Hamlin was a liar. Beginning with Hamlin's direct examination, the government itself elicited his admission that, at the outset of his interrogation, he had lied to the police by giving three false versions of the robbery, including the urination feature. Defense counsel freely cross-examined him on his prevarication. Hamlin's credibility was further tainted by admission in evidence of his Maryland conviction, "accessory after the fact to robbery," pursuant to a plea agreement for which he received a year's probation.[31] In addition, Hamlin acknowledged during direct and cross-examination that in Maryland he had received a substantially reduced sentence because of his testimony; that he was testifying in this case pursuant to a plea agreement; that in return for his cooperation the government had agreed to drop some of the charges against him; and that he pleaded guilty, accordingly, to second-degree murder, conspiracy, and robbery. This testimony had a bearing, primarily, on possible bias, but in doing so it also had an impact that diminished Hamlin's credibility. Without regard to the specifics of Hamlin's Maryland testimony, therefore, the jury "was afforded not merely 'sufficient' information to make an appraisal of [Hamlin's] testimony [in this case], but an extraordinarily complete and substantive basis for evaluating" his credibility.[32]

Finally, while perhaps adding a small measure of doubt about Hamlin's credibility, his Maryland testimony—as the trial court perceived it—not only might have confused the jury as to its relevance but also, of greater significance, would likely have justified the government's seeking admission of additional evidence about the Maryland trial that, in the end, could well

---

31. See *supra* note 27.

32. *McClellan v. United States*, 706 A.2d 542, 549 (D.C.1997). In support of his argument for admissibility of Hamlin's Maryland testimony, appellant relies on two decisions of this court reversing convictions for sexual abuse because of the trial court's refusal to permit cross-examination of a key government witness about her previous reports of similar abuse by other adults. *See Obiazor v. United States*, 964 A.2d 147, 151 (D.C.2009) (cross-examination of complaining witness); *Lawrence v. United States*, 482 A.2d 374, 376–77 (D.C.1984) (cross-examination of complaining witness's aunt). Each defendant was awarded a new trial because counsel had been for-bidden to challenge credibility by attempting to elicit evidence of prior false accusations. In this case, however, although Hamlin initially told the police a story—the "urination" scenario—that was strikingly similar to his testimony in the earlier, Maryland case, he later admitted that this particular scenario, plus two other stories he had told, were all lies. Because the evidence before the jury was more than sufficient to establish Hamlin as a liar, the details of the Maryland case, apart from the fact of Hamlin's conviction itself, would have been of minimal additional value in attacking Hamlin's credibility. Neither *Obiazor* nor *Lawrence*, therefore, compels the cross-examination appellant was seeking.

have created a side-show leading to even greater confusion.[33] For example, in response to defense counsel's motion *in limine,* the government argued that the Maryland jury must have credited Hamlin's "urination" scenario because it convicted the defendant—an indication that Hamlin had told the truth. Had Hamlin's Maryland testimony been admitted, therefore, a prolonged hearing, collateral to the issues in this case, might well have been required to sort out its relevance, if any. Accordingly, in view of the other evidence—most powerfully Hamlin's own admissions—that Hamlin was a liar, the probative value of the Maryland testimony, when compared to this likely prejudicial impact on the government's case, offers no basis for second-guessing the trial court's discretionary judgment that appellant's request for admission of the Maryland testimony should be denied.

### B.

■ The second challenged restriction on cross-examination occurred during trial when counsel attempted to question Hamlin about a statement allegedly made to him by Detective Truesdale during Ham-

lin's interrogation. According to Hamlin, before he told the police what had happened during the robbery of Rosenbaum, Detective Truesdale had said to him that appellant had put him in a "fucked up" position by "pulling a stunt." Appellant wanted to introduce these statements in the hope of eliciting from Hamlin an admission that he had developed his story of what happened in this case based on what the detective had said to him. The trial court advised defense counsel that he could ask Hamlin about the statements but could not quote them.

After that ruling, counsel cross-examined Hamlin, as permitted, and elicited an affirmative response when he asked Hamlin whether the detective had "suggested" what had happened.[34] We find no abuse of discretion here. Counsel was permitted to ask Hamlin whether the detective's statements had influenced his story, and Hamlin answered that they had. That, as the government points out, was "the very point he sought to establish." Admission of the statements the officer made would have added colorful flavor, but they were not at all necessary to achievement of counsel's purpose.[35]

---

**33.** *See Hager v. United States,* 791 A.2d 911, 914 (D.C.2002) ("trial judge must balance the probative value of the evidence against the risk of prejudicial impact, including the risk of jury confusion from a 'trial-within-a-trial,' and may exclude marginally relevant evidence if it will distract the jury from the issue in this case").

**34.** Counsel asked whether the detective had suggested to him a scenario for what had happened; whether that suggestion was made before Hamlin mentioned appellant's involvement in the robbery; whether the detective had suggested that appellant had instigated the robbery; and whether Hamlin had "followed that suggestion and followed that story." Hamlin responded affirmatively to each question.

**35.** Counsel relies on our decision in *Martinez v. United States,* 982 A.2d 789 (D.C.2009), where we held that the trial court erred when it precluded cross-examination of a police detective about information the defense had received indicating that the detective "had been relieved of his powers as a police officer and [was] under investigation for a number of matters." *Id.* at 792. The concern was bias, *i.e.,* that the detective would tailor his testimony to assist the government in an effort to curry favor that might help him during the investigation. In the issue before us, however, the concern was Hamlin's own credibility, not the alleged bias of the detective whose statements Hamlin's counsel was seeking to introduce. But putting aside that distinction, *Martinez* is altogether inapposite for a reason more fundamental: the trial court here did not preclude all inquiry about Hamlin's inter-

## IV.

■ During closing argument, the prosecutor referred to surveillance photographs from a gas station in the area where Rosenbaum was attacked. They were taken shortly after the robbery and showed appellant going into the station. The prosecutor asked the jury, "So, what's the explanation? What's he doing there?" Defense counsel immediately objected, was overruled, and, after the argument, moved for a mistrial contending that the comment improperly shifted the burden of proof. The trial court denied the mistrial, ruling that the comment was not "in any way prejudicial or contrary to the law."

■ On appeal, the argument is more specific. The prosecutor, says appellant, shifted the burden of proof to the defense because the challenged comments to the jury were, in effect, comments on appellant's failure to testify at trial, in violation of his Fifth Amendment privilege against self-incrimination.[36] We have stressed that a prosecutor may not make a comment that is "manifestly intended or of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify."[37] No impropriety occurs, however, when a prosecutor merely emphasizes that the government's evidence is uncontradicted.[38] Moreover, in assessing the propriety of the comments in question, we view them in the context of the prosecutor's argument.[39]

The prosecutor cannot be faulted here. We agree with the government that the prosecutor merely asked rhetorical questions that did not "naturally lead the jury to focus on defendant's silence."[40] Rather, as she explained to the jury, they were meant to highlight that "there is only one explanation that makes sense." In context, therefore, these comments did not shift the burden of proof by highlighting the defendant's failure to testify. Thus, no error occurred in the trial court's refusal to grant a mistrial.

## V.

■ Finally, appellant argues that the trial court erred by failing to strike his nickname, "Master P," from the indictment. A trial court may strike surplusage from the indictment on motion of the defendant,[41] and its ruling is reviewable for abuse of discretion.[42] "A motion to strike surplusage should be granted only if it is clear that the surplusage is (1) not relevant to the charges; (2) inflammatory; and (3) prejudicial."[43]

This court generally disfavors the inclusion of an alias in the indictment, unless the alias is needed for identification of the

action with the detective; to the contrary, the court prohibited very little.

36. *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (Fifth Amendment forbids "comment by the prosecution on the accused's silence"); *Jackson v. United States*, 623 A.2d 571, 585 (D.C.1993) ("Fifth Amendment precludes the prosecutor from commenting on the silence of the accused").

37. *Watts v. United States*, 449 A.2d 308, 312 (D.C.1982).

38. *Jackson*, 623 A.2d at 586.

39. *Id.*

40. *Id.*

41. Super. Ct.Crim. R. 7(d).

42. *See United States v. Rezaq*, 908 F.Supp. 6, 8 (D.D.C.1995) (construing Fed.R.Crim.P. 7(d) with operative words identical to Super. Ct. Crim. R. 7(d)).

43. *Id.* (citing Wright, Federal Practice and Procedure: Criminal § 127, at 426).

defendant, which is not the case here.[44] We cannot say, however, that inclusion of appellant's nickname was inflammatory and prejudicial. The prosecutor referred to the nickname in passing during opening statement, and one witness testified that he knew appellant as "Master P." That was all. The trial record, therefore, does not support an argument that the government "took unfair advantage" of appellant's use of an alias.[45] Nor does the record show that the alias gave Jordan a "veneer of arrogance," as he suggests in his brief. No error occurred, therefore, in the trial court's refusal to strike the alias from the indictment.

\*     \*     \*     \*     \*     \*

For the foregoing reasons we affirm appellant's convictions, remanding for amendment of the judgment and commitment order to account for merged offenses.[46]

*So ordered.*

FERREN, Senior Judge, concurring:

I concur fully in the opinion of the court but wish to add this postscript. The trial judge's discretion as to reinstruction[1] signifies the right and responsibility to choose from "within the range of permissible alternatives."[2] In the present case, the judge had to evaluate (1) whether there was a reasonable possibility that his failure to answer "yes" (without more) to the first question might lead the jury to convict appellant by misapplying the law (most likely by using an accomplice liability theory); and, on the other hand, (2) whether answering the question would coerce the verdict because, as counsel conceded on appeal, a "yes" answer would tell the jury that, upon a finding that appellant had struck David Rosenbaum—the only theory and direct evidence in this case—he had caused Rosenbaum's death.

These two alternatives reveal the tension between the line of cases requiring trial judges to reinstruct when the jury is likely to misapply the law,[3] and case law warning judges against reinstruction that would apply law to the facts and thereby put the judge in the jury box.[4] For the sake of argument, I am willing to assume that, had the trial judge answered "yes" to the jury's first question, he would have acted "within the range of permissible alternatives",[5] in order to ward off improper jury speculation about accomplice liability (or even about an intervening cause of death during the two days that David Rosenbaum was lingering at the hospital). But, for the reasons stated in this court's opinion, I am more than satisfied that the trial judge acted within his proper range of discretion by electing the second alternative, declining to answer the jurors' question, and redirecting them to the initial instruction on "cause."

Although it may have been possible, defense counsel did not suggest a way for the judge to point out that no evidence had

---

**44.** *See Bailey v. United States,* 544 A.2d 289 (D.C.1988).

**45.** *See id.* at 290.

**46.** See *supra* note 6.

**1.** *Davis v. United States,* 510 A.2d 1051, 1052 (D.C.1986) (per curiam).

**2.** *Johnson v. United States,* 398 A.2d 354, 365 (D.C.1979).

**3.** *See Whitaker v. United States,* 617 A.2d 499, 502 (D.C.1992), and *Potter v. United States,* 534 A.2d 943, 946 (D.C.1987) (both summarized in the court's opinion, *ante* at note 14).

**4.** *See Graham v. United States,* 703 A.2d 825, 832 (D.C.1997). This decision is (summarized in the court's opinion, *ante* at note 13).

**5.** *Johnson, supra* note 2, 398 A.2d at 365.

been presented concerning the cause of death, other than evidence that the victim had been physically struck, without leaving the impression that the judge himself was endorsing a finding that appellant had been the striker. And given the propriety of the trial judge's decision not to reinstruct, he had no obligation to try to craft such an instruction *sua sponte*.