*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-CF-287

RUSSELL H. BROCKSMITH, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(CF3-14622-11)

(Hon. Thomas J. Motley, Trial Judge)

(Argued May 28, 2014                    Decided September 18, 2014)

*Joshua Deahl*, Public Defender Service, with whom *James W. Klein* and *Samia Fam*, Public Defender Service, were on the brief, for appellant.

*Lauren R. Bates*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, and *Elizabeth Trosman* and *Thomas Bednar*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and BLACKBURNE-RIGSBY, *Associate Judges*, and NEBEKER, *Senior Judge*.

Opinion for the court by *Associate Judge* BLACKBURNE-RIGSBY.

Concurring opinion by *Associate Judge* GLICKMAN at page 30.

BLACKBURNE-RIGSBY, *Associate Judge*:  Following a jury trial, appellant

Russell Brocksmith was found guilty of assault with intent to commit robbery

("AWIR").[1] The complainant, Valerie Villalta, is a male-to-female transgender person. Because this was appellant's third violent crime conviction, the trial court imposed an enhanced sentence of fifteen years in prison, followed by five years of supervised release.[2]

On appeal, appellant principally argues that the trial court committed reversible error by reinstructing the jury on "reasonable inferences" during jury deliberations. Specifically, the court gave the reinstruction in response to a juror's note asking whether, in determining witness credibility, he or she could take into consideration the belief that the complainant had an "overwhelming incentive" not to report the crime for fear of discrimination and exposing herself as transgender. Appellant argues that there was no evidence that the complainant harbored such fears, and that, consequently, the trial court's neutral response misled the jury into believing that it could consider a theory that appellant contends was unsupported by the record and speculative. Alternatively, appellant argues that the case should be remanded for resentencing for two reasons: (1) the trial court misread the sentence enhancement statute, § 22-1804a, to impose a "presumption" against suspending any part of his fifteen-year sentence; and (2) the trial court did not

---

[1] D.C. Code § 22-401 (2001).

[2] D.C. Code § 22-1804a (a)(2) (2009 Supp.).

strictly comply with the required procedures of D.C. Code § 23-111 (2001), prior to handing down the enhanced sentence.

We affirm. In light of the evidence and arguments made at trial, the trial court's reinstruction did not have the effect of encouraging the jury to engage in improper speculation because there was evidence to support the inference that the juror's note sought to make. Further, on this record, we conclude that a remand for resentencing is unnecessary.

## I.    Factual Background

### A. *The Assault*

On August 1, 2011, at approximately 4:00 p.m., Ms. Villalta[3] was walking home from work along 16th Street and Buchanan Street in Northwest, Washington, D.C. When she walked past appellant — whom she had seen around the neighborhood on three or four prior occasions — he "immediately attacked" her

---

[3] Ms. Villalta is an immigrant from El Salvador, who lived in the District of Columbia for five years leading up to the trial. She worked as a chef in a French restaurant in the city. Ms. Villalta spoke some English and communicated with the police without assistance, but was provided an interpreter for purposes of trial.

and tried to steal her handbag. Ms. Villalta resisted by holding onto her bag and, in response, appellant grabbed her hair, wrapped it around his hand "very tightly," and cursed "f***ing b***h, give me your purse." Appellant then punched Ms. Villalta in the head three or four times. Ms. Villalta threatened to call the police, which caused appellant to stop his attack and walk away very quickly. Although still frightened, Ms. Villalta grabbed her cell phone and snapped a photograph of appellant as he scurried away. Ms. Villalta then went home and called the police roughly ten to fifteen minutes later. The police stopped appellant based on Ms. Villalta's description. Thereafter, Ms. Villalta identified him at the location where he was stopped, and appellant was arrested.

### B. The Trial

The government's case relied heavily on Ms. Villalta's account. Consequently, the defense's primary strategy was to attack Ms. Villalta's credibility, arguing in its opening statement that Ms. Villalta fabricated the assault after appellant rebuffed her unwanted sexual overtures and insulted her as he walked past her on the street. As part of this strategy, the defense emphasized Ms. Villalta's status as a transgender female and claimed that because appellant's

insults "cut deep" and "went to the core of who she was," Ms. Villalta decided to "get even" with appellant by having him falsely arrested.[4]

Defense counsel's cross-examination of Ms. Villalta further sought to engrain this impression on the jury. Specifically, counsel first questioned Ms. Villalta as to why she delayed calling the police, asking: "[A]t the moment that you started walking toward your house from the alley, you weren't sure whether you were going to call the police or not? Is that your testimony?" She answered: "I was scared. I didn't know whether to call the police or not." Then, later on, defense counsel and Ms. Villalta engaged in the following parley:

> Defense Counsel: You made a sexual advance at [appellant]?
> Ms. Villalta: I'm sorry?

---

[4] Specifically, during opening statement, defense counsel stated:

> You will see and you will learn that the complainant in this case is a transgender male [sic]. And [appellant's] insults were insults that cut deep. Insults that went to the core of who she was. Ms. Villalta had heard these kinds of insults before. But on this day she decides she's not going to let —

At this point, the government objected on the ground that there was no good faith basis to open with "what she has heard before and how that would come into this case and how it's relevant." The trial court sustained the objection and defense counsel continued his argument, stating: "So on this day Ms. Villalta decides she's going to get even with [appellant] for insulting her."

| | |
|---|---|
| Defense Counsel: | You made a sexual advance at [appellant?] |
| Ms. Villalta: | I never did that. |

. . . .

| | |
|---|---|
| Defense Counsel: | He pushed you away at that point? |
| Ms. Villalta: | That never happened. |
| Defense Counsel: | He insulted you? |
| Ms. Villalta: | That never happened. When he insulted me was when he was holding me by the hair and when he tried to steal my purse. |
| Defense Counsel: | He insulted you for being a transgender person, right? |
| Ms. Villalta: | I don't know whether he did it because that's — I'm a person that's like that. I never did anything to call his attention to me. So I really don't understand. |

. . . .

| | |
|---|---|
| Defense Counsel: | So you have been insulted in the past for your status as a transgender person, right? |
| Ms. Villalta: | Well, I don't know if when people look at me they know that I'm a transgender person. |
| Defense Counsel: | Well, on this day you were offended by [appellant's] words, right? |
| Ms. Villalta: | Of course. |

Subsequently, the government's redirect focused on Ms. Villalta's thought process after the assault, presumably to show why she hesitated in calling the police. In response, Ms. Villalta testified:

> A lot of things went through my head. I repeat, I was afraid. Never in my life has an incident like this happened to me here. It's a bit difficult to explain. I never would have wanted this to happen to me. I know I'm a transgender person. And this happened to me . . . .[5]

Ms. Villalta also explained that she initially hesitated in calling the police because she was afraid that the police "would not arrest [appellant] and [she] could have run into him again and he could have done it again[,]" but that she ultimately decided to do so because: "[H]e hit me and he tried to rob me and it hurt too much, and at the same time I was afraid."

Additionally, the government proffered into evidence the photograph that Ms. Villalta had taken of appellant, her 911 call, and the testimony of the responding police officers for corroboration. Detective Robert Schmidt of the Metropolitan Police Department ("MPD") testified that he brought Ms. Villalta to the location where appellant was stopped for a show-up identification. He observed that Ms. Villalta was "upset, flustered" and had a flushed face, red marks on her left arm, and hair "coming right out" of her head. Officer Bryon Words similarly testified that, upon responding to Ms. Villalta's 911 call, she immediately

---

[5] Ms. Villalta continued by stating "but it could have happened to any of you[,]" to which the defense lodged an objection, which was sustained, and an instruction was given to the jury.

showed him the photograph of appellant and told him that he tried to rob her. Her demeanor was "upset," "aggravated," and "depressed," and her appearance was notable for the redness on her wrists and neck. Lastly, Officer Krystal Cannata testified that Ms. Villalta had shaky hands and was nervous when she met her, and that she felt a "lump" or "knot" in the back of Ms. Villalta's head and observed a "clump" of her hair falling out. The defense's sole witness was Pastor James Lumpkins, who testified that he gave appellant fifty dollars for a commercial driver's license, the inference being that appellant had no reason to rob Ms. Villalta.[6]

The trial court gave the jury instructions prior to deliberation, which included the standard instructions on the function of the jury to determine the facts of the case and the believability of witnesses, *see* Criminal Jury Instructions for the District of Columbia, No. 2.102 (5th ed. rev. 2013). As part of this standard instruction, the court also articulated to the jury that it should determine the facts without prejudice, and should not be improperly influenced by "one's race, ethnic origin or gender[,]" and that it must decide the case "solely from a fair consideration of the evidence." The court also instructed the jury that it was

---

[6] The parties stipulated that appellant had $68.41 in cash on his person at the time of arrest.

"permitted to draw from the facts, which you find have been proven, such reasonable inferences as you feel are justified in light of your experience," *see* Criminal Jury Instructions, No. 2.104.

### C. *Jury Deliberations*

During deliberations the following day, Juror No. 1 submitted the following question to the trial court:

> Your Honor, I believe that the claimant [i.e., Ms. Villalta] most likely has an overwhelming incentive to not report an assault because it would mean she would or could expose herself as LGBT/transgendered to authorities and total strangers and the general public many of whom may have deep seated an[]imosity and hostility towards her and possibly risk danger. Am I permitted to consider this as I evaluate the credibility of the claimant[?]

The trial court, government, and defense counsel engaged in a colloquy on the appropriate response, to which defense counsel asked the court to instruct the juror that he or she could not consider this factor in determining Ms. Villalta's credibility because "there's no evidence that the witness is in any way . . . trying to hide . . . her sexual orientation or the fact that she's transgender or that she was worried that's something that would come out." The trial court

disagreed with defense counsel's contention, observing that there was evidence Ms. Villalta was transgender and hesitated before calling the police, and that, as a result, "[s]urely you can't say the opposite that it is an unreasonable inference." However, the trial court noted that it was "very concerned" not to answer the question directly because it did not want to tell the jury whether "that's a valid inference one way or another." Consequently, the trial court reinstructed the jury by referencing them back to the court's initial instructions on reasonable inferences, i.e., "[w]hen you consider the evidence, you are permitted to draw, from the facts which you find have been proven, such reasonable inferences as you feel are justified in light of your experience." The court's response added: "It is for the jury to make such determinations, not for the [c]ourt." The jury reached a guilty verdict soon after. This appeal followed.

## II.    The Jury Reinstruction Issue

"Decisions regarding reinstruction of a jury are committed to the discretion of the trial court; absent abuse of that discretion we will not reverse." *Jordan v. United States*, 18 A.3d 703, 707 (D.C. 2011) (quoting *Davis v. United States*, 510 A.2d 1051, 1052 (D.C. 1986) (per curiam)) (internal quotation marks omitted). "In determining whether a particular instruction was appropriate, this court analyzes

each case on its own facts and circumstances." *Scott v. United States*, 954 A.2d 1037, 1045 (D.C. 2008) (citation and internal quotation marks omitted). "The central question for this court in its review of a challenged jury instruction is whether the instruction is an adequate statement of the law, and whether it is supported by evidence in the case." *Id.* (citing *Wheeler v. United States*, 930 A.2d 232, 238 (D.C. 2007)) (internal quotation marks omitted). In some instances, a jury reinstruction may be legally accurate but have the effect of leading the jury to misapply the law. *See, e.g.*, *State v. Burris*, 797 N.W.2d 430, 442 (Wis. 2011); *see also Blaine v. United States*, 18 A.3d 766, 777 (D.C. 2011). Thus, we must examine the challenged reinstruction "in light of the proceedings as a whole." *Burris*, *supra*, 797 N.W.2d at 442; *see also Scott*, *supra*, 954 A.2d at 1045.

In this case, the trial court's reinstruction simply repeated its initial directions on reasonable inferences, *see* Criminal Jury Instructions, No. 2.104.[7]

---

[7] In his brief, appellant also argues that the trial court's reinstruction allowed the jury to freely draw whatever inferences it saw fit, without "any reminder that their verdict must be based on the evidence." This is an overreach. The court's answer read as follows: "[w]hen you consider the *evidence*, you are permitted to draw, *from the facts which you find have been proven*, such reasonable inferences as you feel are justified in light of your experience." (Emphasis added). Thus, the trial court's reinstruction did not allow the jury to speculate with wild abandon without regard to the evidence produced at trial. *See, e.g.*, *Swanson v. United States*, 602 A.2d 1102, 1107 (D.C. 1992) ("[The] jury is presumed to follow instructions . . . ." (citations and internal quotation marks omitted)).

However, appellant argues that, as a response to Juror No. 1's inquiry, the trial court's legally correct answer "misled" the jury into believing that it could consider the unsupported notion that Ms. Villalta had an "overwhelming incentive not to report" a crime because she was transgender, and that by extension she was a more credible witness for coming forward, based on the jury's personal biases, rather than on the evidence at hand. In appellant's view, the trial court should have either affirmatively corrected the juror on his or her "gender bias," or it should have reminded the jury that the verdict "must not be improperly influenced" by a witness' gender. Appellant's contention hinges on the idea that there is no evidence from which the jury could have reasonably inferred that Ms. Villalta was fearful to report the assault on account of being transgender because if such evidence exists, the trial court necessarily could not have abused its discretion by referring the jury back to its initial instructions on reasonable inferences in order to avoid invading the jury's province as fact-finder. *See, e.g.*, *Jordan*, *supra*, 18 A.3d at 707; *cf. Burris*, *supra*, 797 N.W.2d at 442-43. Consequently, we must determine whether the "facts and circumstances" of this case *could* support such a reasonable inference. In deciding this question, we are guided by the following principles.

"It is axiomatic that questions of credibility are for the jury." *Kinard v. United States*, 416 A.2d 1232, 1235 (D.C. 1980). The jury's decision on the

credibility of witnesses, however, should not be improperly influenced by biases regarding "anyone's race, ethnic origin, or gender." Criminal Jury Instructions, No. 2.102; *see also J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 153 (1994) (Kennedy, J. concurring) ("We do not prohibit racial and gender bias in jury selection only to encourage it in jury deliberations. Once seated, a juror should not give free rein to some racial or gender bias of his or her own."). Nonetheless, the jury is entitled to draw "a vast range of reasonable inferences from the evidence," and which it feels justified in light of experience, so long as its conclusions are not based "on mere speculation." *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc) (citation and internal quotation marks omitted); Criminal Jury Instructions, No. 2.104; *see, e.g.*, *Hill v. Metro. African Methodist Episcopal Church*, 779 A.2d 906, 909 (D.C. 2001) ("The jury . . . surely could use its common sense and everyday experience to infer reasonably from the evidence . . . ." (citation omitted)). It is sometimes difficult to differentiate between a reasonable inference and speculation. *Cf. Rivas*, *supra*, 783 A.2d at 136. An "inference" is "[a] conclusion reached by considering other facts and deducing a logical consequence from them." Black's Law Dictionary 793 (8th ed. 2004); *see also Harrison v. United States*, 60 A.3d 1155, 1163 (D.C. 2012) ("[A]n inference is a factual conclusion that can rationally be drawn from other facts." (citing *Smith v. State*, 999 A.2d 986, 991 (Md. 2010)) (alteration in original)). In contrast,

"speculation" is "[t]he act or practice of theorizing about matters over which there is no certain knowledge." Black's Law Dictionary at 1435.

Here, the record displays enough evidence from which the jury could "logically deduce" that Ms. Villalta had a disincentive to contact the police for fear of discrimination and exposure. In response to defense counsel's questioning as to why she hesitated before calling the police, Ms. Villalta testified that she was initially not sure whether she was going to call the police because she was "scared," and "thought about it many times." On redirect, she emphasized that "[a] lot of things went through my head," that "[i]t's a bit difficult to explain[,]" and that she knows she is "a transgender person" and a crime was committed against her. This answer was largely in response to defense counsel's own questions alluding to the fact that Ms. Villalta faced discrimination for being transgender and had been the subject of previous insults and hostility, a point that was also referenced in the defense' opening statement. In addition to this testimony, the jury could have also considered Ms. Villalta's demeanor on the stand in concluding that she feared exposure of her gender status. It is well-established that the jury is uniquely positioned to determine witness credibility based on the witness' demeanor on the stand, which is "of the utmost importance in the determination of credibility of a witness." *Brooks v. United States*, 39 A.3d 873, 884 (D.C. 2012)

(citation, internal quotation marks, and alterations omitted). While the record does not clearly reflect Ms. Villalta's actual demeanor on the stand, at sentencing the government noted — which was not disputed — that the fear Ms. Villalta had was "palpable when she testified in court," and that she had "difficulty even turning to face [appellant] during the in-court identification." Thus, her potential demeanor on the stand and testimony about being "afraid" and recognition that she is a transgender person against whom a crime had been committed, coupled with the jury's common-sense knowledge that transgender individuals face hostility and discrimination in our society, *cf. Smith v. Colorado Interstate Gas Co.*, 794 F. Supp. 1035, 1044 (D. Colo. 1992) ("Gender and race discrimination are issues an average person can evaluate and understand without the assistance of an expert."), was enough for the jury to reasonably infer that Ms. Villalta was fearful to report the crime on account of being exposed as a transgender person.[8]

---

[8] The hostility and discrimination that transgender individuals face in our society today is well-documented. According to The National Transgender Discrimination Survey Report, the "most extensive survey of transgender discrimination ever taken," a large majority (71%) of transgender individuals "attempted to avoid discrimination by hiding their gender or gender transition," and almost half of respondents (46%) feel uncomfortable seeking police assistance. *See* Jaime M. Grant, et al., *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*, Nat'l Ctr. For Transgender Equality and Nat'l Gay and Lesbian Taskforce, 3, 6 (2011), *available at* http://endtransdiscrimination.org/PDFs/NTDS_Report.pdf.

Appellant contends that there was no concrete testimony that Ms. Villalta feared revealing her transgender status to authorities, largely focusing on the fact that she never explicitly admitted that being transgender factored into her decision to contact the police, and that it was more about her not wanting to "run into" appellant again. Appellant also points to Ms. Villalta's response to a question posed to her about being subject to prior insults, in which she stated: "I don't know if when people look at me they know that I'm a transgender person." Certainly, her testimony on these points could support the notion that Ms. Villalta did not fear discrimination or reprisal by reporting the crime. However, the existence of another contrary reasonable inference, which could be drawn from the evidence, does not negate all other reasonable inferences. Such conflicts are for the jury to resolve as the trier of fact. *Cf. Schools v. United States*, 84 A.3d 503, 508 (D.C. 2013) ("[A] reviewing court[,] *faced with a record of historical facts that supports conflicting inferences*[,] must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." (emphasis added) (second and third alterations in original) (citation and internal quotation marks omitted)). Moreover, the jury need not have accepted portions of her testimony in which she sought to minimize her transgender status, especially given her later statements on rebuttal in which she indicated that it was "difficult to

explain," and that she "knew" she was transgender. *Cf. Payne v. United States*, 516 A.2d 484, 493 (D.C. 1986) (concluding that "where a witness recants, the trier of fact must decide whether to accept as true the witness' original testimony or revised testimony").[9]

This scenario is not analogous to situations where we have instructed the jury that it cannot make credibility findings solely on the basis that the witness is a police officer. *See Braxton v. United States*, 852 A.2d 941, 943 (D.C. 2004). Nor, like in *Mejia v. United States*, 916 A.2d 900, 902-03 (D.C. 2007), where this court concluded that the trial court's musings regarding the generalized sexual practices of some people in El Salvador demonstrated an appearance of judicial bias. As recognized and differentiated in *Braxton*, here, there was no improper gender bias

---

[9] This case is also distinguishable from *Clayborne v. United States*, 751 A.2d 956, 969 (D.C. 2000), where we concluded that the prosecutor overreached when he asked the jury to infer that a critical defense witness, Clarence Aull, knew who shot him on prior occasions, but would not say so in fear of being labeled a "snitch," and that he was therefore not a credible witness. Aull had denied knowing his assailants and there was no evidence that Aull had such knowledge. *Id.* We concluded that "[w]ithout such evidence, the inference that Aull was lying when he denied being able to identify his assailants was too speculative." *Id.* In contrast, there was evidence from which the jury could reasonably infer that Ms. Villalta feared reporting the crime on account of her gender status. Specifically, the evidence showed that she hesitated for about ten to fifteen minutes before calling the police, that she was "scared" and "a lot of things" were going through her head, and that she recognized that she was transgender. The jury in this case could reasonably infer from her testimony that she had a strong disincentive to report the crime on account of being transgender.

at play because there was a solid evidentiary foundation from which the jury could reasonably make the inference that Ms. Villalta had a disincentive to report the crime on account of fearing exposure as transgender.

In light of these circumstances, the trial court recognized that many potential inferences could be drawn from the evidence, and the court's neutral reinstruction, *see Coreas v. United States*, 565 A.2d 594, 599 (D.C. 1989) ("At a minimum, the trial judge should strive during reinstruction to achieve the ideal of a neutral, balanced instruction." (citation and internal quotation marks omitted)), purposefully sought not to promote one inference over another with regards to Ms. Villalta's credibility. *See Jordan*, *supra*, 18 A.3d at 707 ("If the jury's question focuses not on what the law means *but on how the law should be applied to the facts*, the court should not answer beyond reference to the initial instruction, lest the answer invade the jury's province as fact-finder and, as a result, coerce the verdict." (emphasis added)). Thus, we discern no abuse of judicial discretion.

In any event, any potential error was necessarily harmless. *See Scott*, *supra*, 954 A.2d at 1047.[10] While it is true that the prosecution's case hinged largely on

---

[10] There is some question as to whether the harmless error test, *see Kotteakos v. United States*, 328 U.S. 750, 765 (1946), or the constitutional
(continued . . .)

Ms. Villalta's testimony, when viewed in the entirety of the evidence advanced at trial, the government's case against appellant was, in fact, very strong. Ms. Villalta testified in great detail regarding the attack, including the insults that appellant hurled at her, and the ways in which he assaulted her, i.e., grabbing and twisting her hair, grabbing her bag, and punching her in the head. She was also thoughtful in her explanation as to why she hesitated before calling the police and of her actions after the assault. Moreover, Ms. Villalta's story was corroborated by the photograph that she took of appellant as he escaped from the scene and by the observations of the police officers, who all testified in some fashion that Ms. Villalta was injured and appeared to be upset. Consequently, we can say with fair assurance that any error was harmless.

### III.    The Sentence Remand Issues

Appellant argues in the alternative that this court should remand his case for resentencing because: (1) the trial court mistakenly believed that there was a

---

(. . . continued)

harmless beyond a reasonable doubt test, *see Chapman v. California*, 386 U.S. 18, 24 (1967), applies to situations such as this. *Compare Scott*, *supra*, 954 A.2d at 1047 (reviewing the instructional error under the *Kotteakos* standard), *with Burris*, *supra*, 797 N.W.2d at 442 (contending that a legally accurate instruction may in some instances "unconstitutionally" mislead the jury). However, we conclude that, regardless of the standard of review, any error would be harmless.

legislative "presumption" against suspending any part of his fifteen year prison term; and (2) the trial court erred by failing to make the necessary inquiries under § 23-111 prior to handing down the enhanced sentence. We recite some additional factual background before discussing each of these issues.

## A. Sentencing Background

Prior to trial, the government, as required by § 23-111 (a)(1),[11] filed an information with the court stating that appellant had previously been convicted of two counts of attempted robbery, in 2006 and 2007, respectively, and noting that possible enhancements may apply at sentencing, pursuant to § 22-1804a (a)(2), which states:

---

[11] Subsection (a)(1) states:

> No person who stands convicted of an offense under the laws of the District of Columbia shall be sentenced to increased punishment by reason of one or more previous convictions, unless prior to trial or before entry of a plea of guilty, the United States attorney or the Corporation Counsel, as the case may be, files an information with the clerk of the court, and serves a copy of such information on the person or counsel for the person, stating in writing the previous convictions to be relied upon.

> If a person is convicted in the District of Columbia of a crime of violence as defined by § 22-4501,[12] having previously been convicted of 2 prior crimes of violence not committed on the same occasion, the court, in lieu of the term of imprisonment authorized, *shall impose a term of imprisonment of not less than 15 years and may impose such greater term of imprisonment as it deems necessary* up to, and including, life without possibility of release.

(Emphasis added). At the initial hearing on sentencing after the conclusion of the jury trial, defense counsel conceded that the trial court could technically sentence appellant to fifteen years in prison if it chose to do so. However, counsel argued that this was not a "mandatory minimum" prison sentence, and that the court reserved discretion to suspend any part of the sentence. In response, the trial court emphasized that it understood that it retained discretion in sentencing, and that the minimum fifteen year sentence was not a mandatory prison term. However, the court countered that the statute nonetheless evidenced the legislative intent to give a fifteen year prison term in this type of situation barring mitigating circumstances. In the trial court's view: "[t]he question here I think is if there are mitigating circumstance[s], I could apply . . . but if I found that there were no [mitigating] circumstances, why would I go below [fifteen] is the question."

---

[12] "Crime of violence" includes both robbery and assault with intent to commit robbery. *See* D.C. Code § 22-4501 (1) (2009 Supp.) (citing D.C. Code § 23-1331 (4) (2010 Supp.)).

The government asked the court to "effectuate that legislative intent and impose a sentence of no less than [fifteen] years straight time and not suspend any portion of that sentence." This request was based on Ms. Villalta's trauma, the impact on the community, appellant's failure to take responsibility, and the fact that appellant was already on supervision in three different cases — namely, two convictions for attempted robberies and one conviction for sexual solicitation — at the time of his arrest. The defense asked for a fifteen year sentence, suspended as to all but thirty months, which was the low end of the sentencing guideline range.

In response, the trial court stated that it did not believe a thirty month prison term would be appropriate "even in a plea," and further disagreed with defense counsel's notion that a suspended sentence is equivalent to "giving" a sentence. Moreover, the trial court emphasized that, given appellant's prior record, it would be "meaningless" to put him back on probation because he was already on probation "on not one case, not two cases[,] but three cases in this matter[,]" and that, consequently, "[t]here is no way to say he's a good candidate for probation." The trial court, nonetheless, allowed the parties to submit additional briefing on the legislative intent issue before sentencing. Specifically, the court was interested in the legislative intent of the statute, given that appellant sought to argue that "we

can serve the legislative intent by just saying [fifteen] years and suspend almost the entirety."

The government filed a supplemental memorandum in aid of sentencing, in which it noted that the legislative history of the statute demonstrates that the provision was meant to send "a strong and unequivocal message of legislative intent to the judiciary that repeat offenders are to be punished severely[,]" quoting D.C. Council, Report on Bill 18-151 at 14-15 (June 26, 2009). At the subsequent hearing, the defense again argued that the legislative intent is not necessarily incongruent with suspending a large portion of the fifteen year sentence. After an extended colloquy between the trial court and defense counsel on the matter, appellant addressed the trial court before the court imposed sentence. The trial court then engaged appellant in an informal discussion regarding the circumstances of his two prior attempted robbery convictions, whereby appellant admitted culpability.

Afterwards, the trial court explained and reiterated that, while it understood it had the discretion to go "contrary to the legislative intent" that says fifteen years and suspend a large portion of the sentence, the court simply did not believe that he was a candidate for probation due to the fact that he was on supervised release with

two cases and probation on a third at the time of his arrest, and further observed that at no time did appellant accept responsibility for his actions. The court noted that while fifteen years was a "severe punishment," that was "exactly what the legislature contemplated in this situation," and that appellant failed to give the court "one single reason, either in [his] background or anything for [the court] to go against that legislative intent[.]" The court finished by saying that it "wished there was a good reason [it] could state that this would be an unfairly severe punishment[,]" but appellant had "given [the court] no reason" to do so. Consequently, the trial court sentenced appellant to a fifteen year prison term, followed by five years of supervised release.

## B. The Legislative Intent of D.C. Code § 22-1804

"Generally, sentences within statutory limits are unreviewable aside from constitutional considerations." *Saunders v. United States*, 975 A.2d 165, 167 (D.C. 2009) (quoting *Crawford v. United States*, 628 A.2d 1002, 1003-04 (D.C. 1993) (internal quotation marks omitted)). "Due process may be implicated if the sentencing judge relies on mistaken information or baseless assumptions, but a judge has wide latitude in sentencing matters and may consider any reliable

information, from virtually any source, in deciding what sentence to impose." *Id.* (citing *Wallace v. United States*, 936 A.2d 757, 780 (D.C. 2007)).

In this case, there is no dispute that appellant's fifteen year prison term plus five years supervised release was within the statutory limits. *See* § 22-1804a (a)(2). There is also no dispute that the trial court understood that the statute did not impose a "mandatory minimum," and that it maintained discretion in determining what portion — if any — to suspend of a minimum fifteen year sentence. Rather, appellant contends that the trial court misconstrued § 22-1804a (a)(2), by believing that the legislative intent evinced a "presumption" against suspending any portion of his fifteen year prison sentence. Appellant contends that the D.C. Council was "agnostic" as to how much of the enhanced sentence could be suspended. In support of this position, appellant points to the legislative history, where the D.C. Council stated that the statute did not impose a "mandatory minimum where the judicial officer's discretion is removed."[13]

---

[13] Specifically, the Committee Report on "chronic offenders" states:

> This provision [i.e., the 2009 Act] would amend D.C. Official Code § 22-1804a and 22-1805a to establish a minimum maximum sentence for individuals who repeatedly violate criminal laws. This is not a mandatory minimum where the judicial officer's discretion is removed. Instead, it is a strong and unequivocal message

(continued . . .)

We pass on the question of whether the legislative intent of § 22-1804a favored a minimum fifteen-year prison term because the record shows that, independent of the trial court's interpretation of the intent of the statute, the trial court would not have given appellant a split sentence due to the court's view and conclusion that appellant was simply not a "good candidate" for probation. *See, e.g.*, *Saunders*, *supra*, 975 A.2d at 167 ("The burden is on any appellant who challenges a sentence that is within statutory limits . . . to show that the sentence is actually based on materially false or misleading evidence.").

Specifically, upon reviewing appellant's criminal history, the trial court stated on numerous occasions that it did not find appellant to be a good candidate for probation, given that he was already on supervised release or probation "on not one case, not two cases[,] but three cases" at the time he committed this crime. Later, prior to handing down the sentence, the trial court again emphasized to appellant he had not given the court "one reason" to give him a more lenient sentence and suspend a portion of the minimum fifteen year term, and that the court had no reason to believe that the full sentence was "unfair." Accordingly,

---

(. . . continued)
        of legislative intent to the judiciary that repeat offenders
        are to be punished severely.

Report on Bill 18-151 at 14-15.

regardless of whether the legislative intent of the statute envisioned a fifteen-year prison term, appellant is not entitled to relief because the trial court would not have, in any event, given him a split sentence on the supported basis, *see Saunders*, *supra*, 975 A.2d at 167, that it believed appellant was ill-suited for probation or leniency.

## C. The Court's Duties Under § 23-111 (b)

Lastly, appellant argues for the first time on appeal that the trial court failed to, *sua sponte*, fulfill its duties under § 23-111 (b) prior to giving him an enhanced sentence, and that a remand for resentencing is needed on this basis. Under subsection (b):

> [T]he court shall, after conviction but before pronouncement of sentence, **[1]** inquire of the person with respect to whom the information was filed whether he affirms or denies that he has been previously convicted as alleged in the information, and **[2]** shall inform him that any challenge to a previous conviction which is not made before sentence is imposed may not thereafter be raised to attack the sentence.

§ 23-111 (b) (emphasis added). The government concedes that the trial court did not strictly comply with the requirements of § 23-111 (b), and that the error was therefore "plain." However, the government maintains that a remand is

unwarranted under plain error because appellant cannot show that the error affected his substantial rights or the fairness, integrity, or public reputation of the proceedings. *See United States v. Olano*, 507 U.S. 725, 732 (1993). We agree.

During the sentencing hearing, appellant admitted to his prior convictions, albeit informally, in response to the trial court's inquiries. On appeal, appellant does not contest the validity of these admissions or make any belated-attempt to dispute any prior conviction. *See generally* § 23-111 (c)(1) ("If the person denies any allegation of the information of previous conviction, or claims that any conviction alleged is invalid, he shall file a written response to the information."). In fact, appellant makes no showing whatsoever as to how the trial court's failure to comply with § 23-111 (b) prejudiced his substantial rights or left him worse off than if the trial court had informed him that any challenge to a prior conviction is deemed waived if not raised before sentencing. *See, e.g.*, *Smith v. United States*, 356 A.2d 650, 652 & n.6 (D.C. 1976) (noting that remand was necessary because, while the court passed no judgment on whether any challenge under § 23-111 would be successful, appellate counsel at least represented that there was a basis for challenging the prior conviction).

Rather, appellant hangs his hat on the notion that remand is warranted simply because "[t]his [c]ourt has never tolerated a trial court's failure to comply with its duty to inform a defendant of the consequences of waiver under § 23-111 (b)," and that the trial court's failure to comply with § 23-111 (b) warrants "automatic" remand. Contrary to appellant's argument, however, this court has explicitly declined to adopt "a *per se* rule" requiring remand for resentencing when the procedural error under § 23-111 (b) is essentially harmless. *Norman v. United States*, 623 A.2d 1165, 1169-70 (D.C. 1993). Here, the error was essentially harmless because appellant has not attempted to show any harm, nor do we independently glean from the record any injury, caused by the trial court's omission. In such an instance, "we will not waste scarce judicial resources and remand this case for resentencing." *Id.*

## IV. Conclusion

Based on the forgoing reasons, we hold that the trial court did not err in reinstructing the jury, and that a remand for resentencing is unnecessary given the facts of this case.

*Affirmed.*

GLICKMAN, *Associate Judge*, concurring in the judgment: The majority unnecessarily rests its decision, in part, on a strained characterization of the evidence that I do not share. In my view, we should acknowledge that there was no evidence suggesting the reason the complainant vacillated before calling the police after she was assaulted had anything to do with the fact she is transgender. The only evidence as to why the complainant (briefly) hesitated was her explanation that she was hurt, traumatized, and fearful that appellant would attack her again if the police failed to arrest him. She said nothing to indicate she was apprehensive about disclosing her transgender status to the police or afraid that she would be disbelieved for that reason.

Nonetheless, it was the jury's prerogative to determine the witness's credibility, weigh the evidence, and draw "a vast range of reasonable inferences from the evidence."[14] Jurors are permitted to draw "such reasonable inferences as [they] feel are justified in the light of [their] experience."[15] In exercising that prerogative, "[j]urors may properly use their common sense and evaluate the facts in light of their common knowledge of the natural tendencies and inclinations of

[14] *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc) (quoting *United States v. Long*, 905 F.2d 1572, 1576 (D.C. Cir. 1990)).

[15] Criminal Jury Instructions for the District of Columbia, No. 2.104 (5th ed. 2011).

human beings." [16] "While the line between reasonable inferences and mere speculation is impossible to define with any precision, if there is an experience of logical probability that an ultimate fact will follow a stated narrative or historical fact, then the jury is given the opportunity to draw a conclusion because there is a reasonable probability that the conclusion flows from the proven facts."[17] In light of these principles, it is not easy for me to condemn as impermissible speculation a juror's inference that the complainant had "an overwhelming incentive" not to report the assault to the police because that would mean exposing herself as transgendered "to authorities and total strangers and the general public[,] many of whom may have deep seated animosity and hostility towards her."

But even if this interpretation of the complainant's behavior was not a reasonable inference from the evidence at trial, I do not think it would have been appropriate for the trial judge to tell the jury so. The judge, as he properly recognized, was obligated to respect the jury's fact-finding prerogatives. To that end, we admonish judges not to "intrude[] upon functions," including "the drawing

---

[16] *United States v. Vasquez*, 677 F.3d 685, 692 (5th Cir. 2012) (quoting *United States v. Ayala*, 887 F.2d 62, 67 (5th Cir. 1989) (internal quotation marks omitted).

[17] *United States v. Galbraith*, 20 F.3d 1054, 1057 (10th Cir. 1994) (quoting *Tose v. First Pa. Bank*, 648 F.2d 879, 895 (3d Cir.) (internal citations and quotation marks omitted)).

of legitimate inferences from the facts," that are "the sole province of the jury."[18]

For the judge in this case to have responded to the juror's inquiry by forbidding the inference he described would have been such an unwarranted intrusion, in my opinion. It is fundamental that we trust in the jury's ability to reason these things out for itself in the give-and-take of deliberations and decide for itself whether a proposed inference is a fair one or not. The judge had no reason to think the jury unable to do that here.

For these reasons, I think the judge responded to the juror's inquiry correctly, and certainly did not abuse his discretion, by refraining from expressing any view as to the validity of the juror's supposition, and by reinstructing the jurors that they were permitted to draw such reasonable inferences from the facts found as they felt were justified in light of their experience.[19]

---

[18] *Wheeler v. United States*, 930 A.2d 232, 244 (D.C. 1995) (internal quotation marks omitted).

[19] As to the sentencing issues raised by appellant, the trial judge did not, in my view, misconstrue D.C. Code § 22-1804a (a)(2) or misapprehend the Council's intent in enacting that enhancement provision. In addition, I agree that appellant has not shown himself to be entitled to a remand for resentencing on account of the judge's failure before pronouncing sentence to (1) ask appellant whether he affirmed or denied the prior convictions supporting the enhancement of his sentence, and (2) inform appellant that any challenge to a previous conviction not made before the imposition of his sentence could not be raised thereafter to attack the sentence. It is true that this court has insisted on strict compliance with those

(continued . . .)

---

(. . . continued)

requirements of D.C. Code § 23-111 (b) and not hesitated to remand for resentencing when they have been disregarded. *See, e.g., (Robert) Smith v. United States*, 356 A.2d 650, 652 (D.C. 1976) ("Strict, not substantial compliance, is the rule.") (citing *(Ernestine) Smith v. United States*, 304 A.2d 28, 34 (D.C. 1973)). Nonetheless, it is not too much to demand that an appellant who seeks resentencing on this ground assert that the resentencing would not be an empty formality and a waste of time because he does, in fact, have a challenge to make. That is all appellant needed to do, in my opinion; *see id.* (stating that the assertion having been made, "[w]e need not pass on the inquiry of whether appellant could actually make out a case for challenging the prior conviction"). But appellant did not do it.